IN THE SUPREME COURT OF IOWA

 No. 104 / 03-1953

 Filed February 10, 2006

STATE OF IOWA,

 Appellee,

vs.

KEITH BRAINERD CAREY, SR.,

 Appellant.

 On review from the Iowa Court of Appeals.

 Appeal from the Iowa District Court for Black Hawk County, Alan L.
Pearson, Judge.

 Defendant appeals from convictions for willful injury and going armed
with intent. DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT
AFFIRMED.

 Linda Del Gallo, State Appellate Defender, and Theresa R. Wilson,
Assistant State Appellate Defender, for appellant.

 Thomas J. Miller, Attorney General, Richard J. Bennett, Assistant
Attorney General, Thomas J. Ferguson, County Attorney, and Kim Griffith,
Assistant County Attorney, for appellee.

LARSON, Justice.
 Keith Carey, Sr. was convicted by a jury of willful injury causing
serious injury, Iowa Code § 708.4 (2001), and going armed with intent, Iowa
Code § 708.8. Carey appealed, and the court of appeals affirmed. On
further review, we also affirm.
 I.  Facts and Prior Proceedings.
 The record, when viewed favorably to the verdict, revealed that the
defendant and Anthony VonMoore, the victim, were neighbors. About
9:30 p.m. on May 14, 2003, VonMoore, who was heavily intoxicated (later
testing .273), decided to visit Carey at Carey’s house. After a short
visit, VonMoore started to go home. On his way out of Carey’s house,
VonMoore mentioned that Carey owed VonMoore’s employer $50. Carey became
enraged, grabbed a long-bladed knife, and pursued VonMoore out the door,
saying that he was going to “get” him. VonMoore turned around and saw
Carey swinging the blade. VonMoore suffered five cuts, including one over
his left eye and another that severed a tendon and an artery in his thumb.

 Several witnesses claimed they saw Carey standing on his front porch,
waving a knife (or, according to some testimony, two knives). Natalie, one
of the defendant’s daughters, realized that VonMoore was seriously injured
and called 911. This enraged Carey even further. While Natalie was on the
phone, Carey pushed her down while holding a knife. Police and medical
personnel arrived, tended to VonMoore, and arrested Carey.
 Carey, who claims self-defense, had a different account of the
events. According to Carey, VonMoore came to Carey’s house at 9 p.m. and
lured Carey outside where he hit Carey on the back of his head while his
back was turned. Carey said VonMoore hit him repeatedly and threatened to
injure Carey’s daughter and granddaughter if Carey did not give him money.
According to Carey, the beating at the hands of VonMoore was serious,
testifying that “he hit me many times” and “my head was scrambled up pretty
bad. There was nothing I could do.” The results, Carey claimed, were a
bloody nose, sore jaw, sore ribs, and a missing tooth filling.
 Carey’s account of the incident continued: after VonMoore let him
go, Carey went to his bathroom to clean up his wounds. While in the
bathroom, Carey heard someone enter his house through the front door. He
glanced toward the door and saw VonMoore going up the stairs. Carey lunged
toward VonMoore, tackling him on the stairs. A skirmish ensued, during
which, according to Carey, VonMoore drew a utility knife. Carey took the
knife away from VonMoore and used it against VonMoore in self-defense. All
of this, according to Carey, took place in the foyer of his house, directly
below his daughter Natalie’s bedroom.
 On appeal, the defendant argues (1) the district court failed to give
an instruction on provocation and (2) his trial counsel was ineffective for
failing to object to several instances of prosecutorial misconduct.
 II.  Jury Instructions.
 Carey’s theory at trial was self-defense; however, at the end of the
trial, he also sought to include a jury instruction on provocation. The
district court sustained the State’s objection to the instruction because
it was not supported by the evidence.
 Issues regarding jury instructions are generally reviewed for
correction of errors at law. State v. Breitbach, 488 N.W.2d 444, 449 (Iowa
1992).
 In this case, Jury Instruction No. 19 read in part:

 A person is justified in using reasonable force if he reasonably
 believes the force is necessary to defend himself from any imminent
 use of unlawful force. If the State has proved any one of the
 following elements, the defendant was not justified:

 1.  The defendant started or continued the incident which
 resulted in injury.

The defendant claims that the court erred by failing to include the
following instruction:

 If the defendant provoked the use of force, but [the victim]
 used force greatly disproportionate to the provocation and it was so
 great that the defendant reasonably believed he was in imminent danger
 of death or injury, he is not considered to have provoked the incident
 and his acts would be justified.

He claims the facts of the case supported this instruction because, under
his version of the events, he initiated the second scuffle between himself
and VonMoore when VonMoore entered his house. He claims that the jury
could have concluded that he “started” the second incident, since the first
attack had ended. Thus, he argues this instruction was necessary because
VonMoore used force “greatly disproportionate to the provocation” when he
drew his utility knife.
 We agree with the court of appeals’ resolution of this issue. It
stated:

 If we accept the defendant’s version of the altercation, he did
 not provoke the attack, but rather was attacked first by VonMoore. If
 we accept VonMoore’s version, he made some comments about money, was
 attacked by the defendant, and only tried to defend himself against a
 knife attack. Neither version supports an instruction [that] the
 defendant provoked an attack by VonMoore or that VonMoore responded
 with “greatly disproportionate” force.

A jury could not have believed Carey’s version of the events and also found
that he provoked an attack by VonMoore. The court did not err in refusing
to instruct on provocation.
 III.  The Ineffective-Assistance-of-Counsel Claim.
 Carey contends that the assistant county attorney committed misconduct
on several occasions throughout the trial and during closing arguments.
Because his trial counsel did not object to any of these alleged
improprieties, he challenges them through an ineffective-assistance-of-
counsel claim.
 State v. Graves, 668 N.W.2d 860 (Iowa 2003), established a framework
for evaluating claims of prosecutor misconduct. In that case, involving
manufacturing and possession of marijuana, the state was required to prove
that Graves had constructive possession by exercising control over
marijuana found in different areas of a house owned by one of his friends.
At trial, the state called only one witness, Officer Jason Steil, who had
arrested and interrogated Graves. Id. at 866. The case rested in large
part on the state’s ability to prove that Graves lived at that house, which
in turn rested on Officer Steil’s testimony. In that testimony, Officer
Steil recounted much of his conversation with Graves, during which he
claimed Graves admitted to living at the house. Id.
 After the prosecution rested, Graves testified on his own behalf. He
claimed he did not live at the house; rather, he simply stored some of his
belongings there and had little or no access to the rooms where the
marijuana was found. Further, he claimed that Officer Steil apparently
misunderstood much of what Graves said during their conversation. Id. at
867.
 Realizing that the case would turn on witness-credibility issues, the
prosecutor mounted what this court described as “a full attack” on Graves’
credibility. Id. at 879. Graves was convicted and, on his appeal, he made
a claim identical to the one in this case: his trial counsel was
ineffective for failing to object to several instances of prosecutorial
misconduct. This court agreed and reversed and remanded for a new trial.
Id. at 884. Graves established rules to be applied in analyzing misconduct
claims, and we apply them here.
 Carey’s claims of misconduct can be grouped into four categories:
(1) asking a “was he lying” question; (2) distorting, on cross-examination,
the defendant’s direct-examination testimony; (3) making statements during
closing argument that were unsupported by the record; and (4) stating that
the defendant’s version of events was untruthful.
 A.  The “was he lying” question. In Graves, we held that it is
misconduct, under any circumstances, for a prosecutor to ask a witness to
comment on the veracity of another witness, Graves, 668 N.W.2d at 873,
because such questions (1) tend to invade the province of the jury to
determine witness credibility; (2) have no probative value and tend to be
argumentative; (3) may mislead the jury, as they imply that the jury must
find that a state’s witness is lying in order to convict the defendant; (4)
are solely designed to make the defendant look bad regardless of the answer
given; and (5) are inconsistent with the prosecutor’s duties of seeking
justice and insuring a fair trial. Id. at 871-73.
 In Carey’s case, the State called Dr. Rajendra Singh to testify.
Dr. Singh stated that he fully examined Carey when the police brought him
to the hospital, and during that examination, he did not see any signs of
injury nor did Carey complain of any injuries. Later, following the
defendant’s direct testimony in which he described the attack in which
VonMoore allegedly injured him severely, the prosecutor asked Carey the
following questions:

 Q.  And you didn’t make any complaint to the doctor about any of
 this; did you? A. I fail to differ, ma’am. Yes, I did.

 Q.  You didn’t tell them about all of this stuff you told us;
 have you? A. I told that man enough to get me some Tylenol.

 Q.  Well according to the doctor he said that you did not
 complain to any injuries, you just asked for Tylenol. That’s what he
 said. A. According to the doctor, as I recall, he said that he, you
 know, touched me, examined me, which never happened.

 Q.  So you’re saying the doctor lied; is that what you’re
 telling us? A. I’m saying that the doctor operated off of a set of
 notes that he happened to have with him.

 Q.  Can you give us any reason—I mean does the doctor have some
 prior relationship with you? A. I’ve never seen that gentleman
 before in my life.

 Q.  So there would be no reason that you know of for the doctor
 to come in and make something up. A. I never said that somebody
 fabricated anything, ma’am.

(Emphasis added.) In Graves this court adopted a “bright-line rule that
bars such inquiries without exception.” Graves, 668 N.W.2d at 873. While
Graves was filed shortly after this case was tried, the principles
underlying that case existed at the time of Carey’s trial, based on the
authorities set out in Graves. We conclude the prosecutor’s question was
misconduct. Unlike in Graves, however, in which the credibility of the
defendant and the sole prosecution witness was the key to the issue of
guilt, the question in the present case as to whether Carey was truthful
about his medical examination was only collaterally relevant to the key
issue, i.e., whether he had inflicted injury upon another person. The
prosecutor’s improper question, however, is relevant in assessing
prejudice, which we discuss later.
 B.  Prosecutor’s misstatement of the defendant’s testimony. The
defendant contends that, during his cross-examination by the prosecutor,
the prosecutor elicited improper bad-acts evidence. On direct examination,
Carey had testified:

 Q.  Were you upset with [Natalie, the defendant’s daughter,]
 calling 911 about this incident? A. Yeah, I was.

 Q.  Why? A. Why—why would she call the police on me? I mean
 I’m the one that got beaten up. I’m the one that got threatened. I’m
 the one that he threatened to kill.

 Q.  Then what happened? A. It’s all a blur—I mean—It’s—Natalie
 says I knocked her down. I don’t remember knocking her down. I just
 don’t. I don’t see why I would knock her down. Hell, she’s my
 daughter.

 On the prosecutor’s cross-examination of Carey, she treated Carey’s
statement on direct examination that, “I don’t see why I would knock her
down,” as if Carey had denied ever hurting her. In response the prosecutor
got Carey to admit that, in 2000, he had assaulted his daughter by choking
her.
 Carey contends that the prosecutor misquoted his direct examination in
which he had not mentioned the event that occurred in 2000. The result, he
claims, was to introduce prior bad-acts evidence. The State counters that
Carey opened the door for this question about his earlier choking of his
daughter by denying that he would hurt her. Ordinarily, bad-acts evidence
may not be used except in limited circumstances. See Iowa Rs. of Evid.
5.403, 5.404(b). That is so because a defendant should be tried for what
he allegedly did, not for who he is. The State argues that Carey’s direct
testimony opened the door for the prosecution to inquire into the earlier
event in which he choked his daughter. See United States v. Segal, 852
F.2d 1152 (9th Cir. 1988).

 While evidence of prior crimes is generally inadmissible under Fed. R.
 Evid. 404(b) and 403, the “invited error” doctrine entitles the
 government to pursue inquiry into a matter, if evidence thereon was
 first introduced by defendant.

Id. at 1155 (citations omitted).
 Even if we assume, as Carey argues, that the prosecutor
mischaracterized his testimony and therefore was guilty of misconduct, we
do not believe it was sufficiently prejudicial to require a new trial for
the reasons we discuss later.
 C.  Prosecutor’s statements in closing argument. Carey next contends
that several statements made by the prosecutor in her closing argument were
unsupported by the evidence and were solely intended to inflame the
passions of the jury.
 We start with the principle that, “[i]n closing arguments, counsel is
allowed some latitude. Counsel may draw conclusions and argue permissible
inferences which reasonably flow from the evidence presented.” State v.
Thornton, 498 N.W.2d 670, 676 (Iowa 1993) (citations omitted); accord
Graves, 668 N.W.2d at 874; State v. Phillips, 226 N.W.2d 16, 19 (Iowa
1975). “‘However, counsel has no right to create evidence or to misstate
the facts.’” State v. Greene, 592 N.W.2d 24, 32 (Iowa 1999) (quoting
Thornton, 498 N.W.2d at 676) (emphasis omitted). Carey highlights three
statements in the prosecutor’s closing argument that he contends were
unsupported by the evidence.
 1.  Carey believes that the prosecutor improperly insinuated, in her
final argument, that Carey’s daughter, Natalie, was an eyewitness to the
events. He contends that, “[i]n fact, Natalie specifically testified that
she was at home during the altercation but did not see or hear anything.”
Carey is mistaken in his factual predicate for this claim. The call
Natalie made to 911 was submitted as evidence, and on that tape, Natalie
told the operator that Carey had a weapon and that he was threatening
people with it. According to the tape, Natalie yelled at Carey and told
him that the police were coming and that he was going to jail. Therefore,
contrary to Carey’s claim, the prosecutor’s statement that Natalie believed
Carey was the assailant is clearly supported by the record.
 2.  The defendant challenges the prosecutor’s statement in her
closing argument that Carey’s 2000 assault on Natalie was “an attack that
included a knife.” The defendant only admitted choking his daughter; he
never mentioned using a knife in the 2000 assault. Potentially, this could
be damaging because the alleged incident involved a knife, which was the
weapon used in the present case.
 Two considerations bear on the resolution of this question. First,
it appears that the prosecutor probably confused, in good faith, the 2000
assault of his daughter (that did not involve a knife) with the 2003 one
that occurred while Natalie was on the telephone with the 911 operator. In
the latter incident, Carey did have a knife that he was wielding while
pushing Natalie to the floor. See Wycoff v. State, 382 N.W.2d 462, 467-68
(Iowa 1986) (holding erroneous comment made in good faith was not
misconduct).
 The second consideration is that the mistaken 2000 “knife” incident
was only alluded to in final argument; it was not presented as evidence.
Under the court’s instruction, arguments of counsel were not to be
considered as evidence. Even if we assume the mistaken knife reference was
not made in good faith, we consider it only as bearing on the ultimate
issue of prejudice.
 3.  The third example of alleged misconduct involves a statement made
by the prosecutor in her rebuttal:

 Now if the defendant got the knife from Mr. VonMoore as he said, no
 one is that good in trying to get a knife from another person that’s
 trying to attack you and not getting an injury. When [the defendant]
 got the knife, as he said, from Mr. VonMoore, if you notice he didn’t
 sustain one cut, bruise, nothing. That’s probably the only person in
 history that’s been successful in not sustaining an injury in
 defending themselves.

The defendant argues that the prosecutor’s assertion that no one, including
the defendant, could successfully defend against a knife attack without
sustaining an injury, is unsupported by the record. That may be so, but it
is strongly suggested by common sense, and we believe it was based on “the
reasonable inferences and conclusions to be drawn from the evidence.”
Graves, 668 N.W.2d at 874. We find no misconduct on this ground because it
strains the imagination that the defendant could have disarmed his
“assailant,” a former boxer, and not sustain even a slight injury.
 D.  Alleged inflammatory statements. The prosecutor made three
statements in her closing argument that, according to Carey, were intended
to inflame the passions of the jury. The first occurred while the
prosecutor was describing Carey’s initial reaction to the police officers
who arrived at the scene. The officers testified that, when they tried to
question him, he just “freaked out.” The prosecutor described the scene:

 [W]ithout warning [the defendant] became violent and aggressive,
 threatening Officer Zubak that he would get him or something to that
 effect. Sounds really familiar doesn’t it? At that point in time,
 though, [he] just didn’t have a knife to get Zubak with as he had
 Mr. VonMoore.

(Emphasis added.)
 The second incident occurred when the prosecutor pointed out
inconsistencies between Carey’s testimony and that of other witnesses.
Specifically, she noted that Carey testified that his daughter, Liz, had
approached him on the day of the attack and said she had an ongoing
conflict with VonMoore. However, Liz testified that she and VonMoore had
no disputes that day. The prosecutor stated: “Liz said there was no
problem when she testified. None. [The defendant] should have sent some
letters to her.” (Emphasis added.) As the defendant notes, this reference
to letters apparently went back to testimony by his other daughter,
Natalie, in which she stated that Carey sent her a “vulgar” letter from
jail. The prosecutor suggested that this letter may have influenced
Natalie’s testimony due to its threatening nature. The “letters” reference
suggested that the defendant perhaps should have sent threatening letters
to his other daughter, Liz, to influence her testimony, since it was
damaging to the defendant.
 The third example occurred when the prosecutor repeated a portion of
Carey’s testimony, noted that it conflicted with nearly every other
witness’s account, and then asked the jury, “What games are [sic] the
defendant playing with you?”
 These three comments, while sarcastic and snide, were based on a
legitimate assessment of the evidence and especially of the defendant’s
credibility and did not constitute misconduct, given the considerable
latitude accorded to lawyers in final arguments.
 E.  Prosecutor’s assertion during closing argument that defendant was
lying while other witnesses were truthful. The defendant points to
instances in the prosecutor’s closing argument where she, impliedly and
expressly, suggested that the defendant lied while giving his account of
the attack and improperly vouched for certain witnesses for the State. In
his brief, he highlights the following: The prosecutor characterized the
defendant’s testimony about his relationship with the victim as “not true.”
 She also noted a conflict in the evidence between the defendant and the
victim concerning whether the victim was wearing a black coat so as to be
able to conceal a knife. She characterized the defendant’s testimony in
that regard as “absolutely not true.” She also stated in her argument that
“a person that’s telling the truth doesn’t need to skirt around the issue,”
an obvious reference to the defendant’s evasive and feigned confusion on
almost all key cross-examination questions. This experience obviously
prompted this statement by the prosecutor that is now challenged as
misconduct:

 [T]he truth always remains constant. The lies that the defendant told
 you are the constantly changing ones that change with the ebb and flow
 as to how things are going at the time.

 At another point the prosecutor argued “[the victim] is telling the
truth. You know he is. Because he doesn’t have any motive in here to try
to get this defendant convicted of any crime . . . . [H]e’s here because
he’s subpoenaed.”
 The prosecutor also said, “You know [the victim] is not lying,” and
stated that the defendant’s version was “baloney,” apparently basing this
assessment on the fact that other witnesses bolstered the victim’s
testimony and virtually all other evidence contradicted the defendant’s
testimony. The prosecutor noted the lack of supporting evidence for the
defendant’s version of the event and then asked, “[W]hy on earth would you
believe anything the defendant says?”
 The issue is how far a prosecutor may go in suggesting that the
defendant gave untruthful testimony. On one hand, “Iowa follows the rule
that it is improper for a prosecutor to call the defendant a liar, to state
the defendant is lying, or to make similar disparaging comments.” Graves,
668 N.W.2d at 876. However, “[n]otwithstanding this prohibition, a
prosecutor is still free ‘to craft an argument that includes reasonable
inferences based on the evidence and . . . when a case turns on which of
two conflicting stories is true, [to argue that] certain testimony is not
believable.’” Id. (quoting State v. Davis, 61 P.3d 701, 710-11 (Kan.
2003)).

 “The key point is that counsel is precluded from using argument to
 vouch personally as to a defendant’s guilt or a witness’s credibility.
 This is true whether the personal belief is purportedly based on
 knowledge of facts not possessed by the jury, counsel’s experience in
 similar cases, or any ground other than the weight of the evidence in
 the trial. A defendant is entitled to have the case decided solely on
 the evidence.”

Id. at 874 (quoting State v. Williams, 334 N.W.2d 742, 744 (Iowa 1983))
(emphasis added).
 The obvious threat addressed by Graves and other of our cases is the
possibility that a jury might convict the defendant for reasons other than
those found in the evidence. Thus, misconduct does not reside in the fact
that the prosecution attempts to tarnish defendant’s credibility or boost
that of the State’s witnesses; such tactics are not only proper, but part
of the prosecutor’s duty. See State v. Comes, 245 Iowa 485, 491, 62 N.W.2d
753, 757 (1954) (“It is of course the duty of a prosecuting officer to
present the state’s cause zealously and effectively within proper
bounds.”). Instead, misconduct occurs when the prosecutor seeks this end
through unnecessary and overinflammatory means that go outside the record
or threaten to improperly incite the passions of the jury.
 In determining whether the prosecutor’s statements to the jury
employed such means, and therefore constituted misconduct, the court should
consider three factors:

 (1) Could one legitimately infer from the evidence that the defendant
 lied? (2) Were the prosecutor’s statements that the defendant lied
 conveyed to the jury as the prosecutor’s personal opinion of the
 defendant’s credibility, or was such argument related to specific
 evidence that tended to show the defendant had been untruthful? and
 (3) Was the argument made in a professional manner, or did it unfairly
 disparage the defendant and tend to cause the jury to decide the case
 based on emotion rather than upon a dispassionate review of the
 evidence?

Graves, 668 N.W.2d at 874-75.
 In considering the first factor, a jury could reasonably conclude
from the evidence that the defendant had lied, as his version of events
differed substantially from that of every other witness. The prosecutor’s
comments were unquestionably based on legitimate inferences that Carey had
been untruthful.
 Under the second factor, the comments about Carey’s truthfulness were
not presented as merely the prosecutor’s personal opinion. This is much
more apparent when the challenged statements are presented in context. For
example, the prosecutor noted that the defendant “talked around the
questions,” that the defendant’s story had changed, that he told his
daughter Liz that he did not remember what happened, and “now he comes up
with this ridiculous story.” The prosecutor stated that “a person that’s
telling the truth doesn’t need to skirt around the issue,” and, in
contrasting the testimony by the victim, attributed credibility to the
victim’s statements “because the truth . . . remains constant. The lies
that the defendant told you are the constantly changing ones that change
with the ebb and flow as to how things are going at the time.” The
prosecutor then pointed out that the defendant was contradicted by other
evidence, including the testimony of Carey’s own daughters.
 Contrary to the defendant’s assertion, the prosecutor did not state
that it was her personal opinion that the defendant lied, nor did she
personally vouch for the victim’s credibility. Instead, she highlighted
for the jury the evidence in the record that showed the inconsistent and
evasive nature of the defendant’s testimony. She compared his testimony
with that of the victim’s, whose story was unchanging. This argument was
proper under the first and second Graves factors.
 Under the third factor, the court must consider under Graves whether
the comments were made to disparage the defendant and to inflame the
passions of the jury. The prosecutor’s comments, when read in context, do
not rise (or sink) to that level. While more professional language could,
and should, have been used to convey the same message, we should not forget
that prosecutors are entitled to some latitude in crafting a closing
argument. Graves, 668 N.W.2d at 874; Phillips, 226 N.W.2d at 19. Jurors,
we believe, are sophisticated enough not to be inflamed or prejudiced by
what would reasonably be categorized as simply being snide or sarcastic
comments.
 The Supreme Court has enunciated the following rule of thumb for
assessing allegations of prosecutorial misconduct:

 [The county attorney] may prosecute with earnestness and vigor—indeed,
 he should do so. But, while he may strike hard blows, he is not at
 liberty to strike foul ones. It is as much his duty to refrain from
 improper methods calculated to produce a wrongful conviction as it is
 to use every legitimate means to bring about a just one.

Berger v. United States, 295 U.S. 78, 88, 55 S. Ct. 629, 633, 79 L. Ed.
1314, 1321 (1935). In Berger the Court held it was a “foul” blow for the
prosecutor to claim personal knowledge about what a witness knew and to
state it was unfair that he could not ask certain questions, while the
defendant’s counsel could twist questions. Id. In Viereck v. United
States, 318 U.S. 236, 247-48, 63 S. Ct. 561, 566-67, 87 L. Ed. 734, 741
(1943), a case tried in wartime, the defendant was likened to the wartime
enemy; this comment was held to be misconduct. In Graves we held that the
prosecutor’s misconduct was prejudicial because disparaging the defendant’s
testimony was the centerpiece of the prosecution. Graves, 668 N.W.2d at
883; see also State v. Vickroy, 205 N.W.2d 748, 750-51 (Iowa 1973) (holding
prosecutor’s urging of jurors to place themselves in position of drunk-
driving victim held to be prejudicial misconduct).
 In contrast, in State v. Williams, 334 N.W.2d 742 (Iowa 1983), the
prosecutor argued that the defendant took the victim to a secluded area “in
my opinion, in an attempt to avoid detection.” The prosecutor also said
that, “I also think it is clear that she was subjected to sexual abuse,”
and that “it seems to me that the money didn’t exist.” In referring to
part of the defendant’s testimony, the prosecutor said “I find that hard to
believe” and “I find that story just a little bit hard to believe. I find
it stretches my imagination.” Williams, 334 N.W.2d at 744. We said:

 The key point is that counsel is precluded from using argument to
 vouch personally as to a defendant’s guilt or a witness’s credibility.
 This is true whether the personal belief is purportedly based on
 knowledge of facts not possessed by the jury, counsel’s experience in
 similar cases, or any other ground than the weight of the evidence in
 the trial. A defendant is entitled to have the case decided solely on
 the evidence.

Id. (citing DR 7—106(c)).
 We declined in Williams to find misconduct because,

 [v]iewed in context, all of the prosecutor’s challenged remarks were
 obviously based on his view of the evidence. He did not in any
 statement insinuate that his opinion was based on non-record facts nor
 can it fairly be said that he personally vouched against the
 credibility of defendant’s testimony.

Id. at 745.
 While this court has held that referring to a defendant as a liar is
misconduct, such comments do not always result in prejudice. It is not so
much the fact that the prosecutor suggests the defendant is untruthful that
creates the misconduct. Graves, 668 N.W.2d at 876 (stating that a
prosecutor is free to argue, based on reasonable inferences drawn from the
evidence, that certain testimony is unbelievable). Instead, it is the use
of the word “liar” itself, as this court found it to be “inflammatory” and
“improper.” Id. (“Iowa has joined those jurisdictions holding it improper
to call the defendant a liar.”).
 In this case, the prosecutor often suggested that the defendant had
been less than truthful regarding his version of events. However, only
once did the prosecutor use the disparaging term “lies” to describe the
defendant’s testimony.
 This case must be distinguished from Graves on this issue. In
Graves, the court stated the “most disturbing” aspect of the prosecutor’s
comments was his suggestion that the defendant had called the arresting
officer a liar. 668 N.W.2d at 880. In that case, the prosecutor stated:
“If you believe [the arresting officer], there is no question that he
[Graves] is guilty as charged.” This, we held, is more than just an
inflammatory statement; it is a misstatement of the law. “[E]ven if the
jury believes the government witnesses have told the truth, it might still
conclude guilt has not been proved beyond a reasonable doubt.” Id.
 In this case, the prosecutor never suggested that Carey referred to
other witnesses as liars. Further, she did not distort the State’s burden
of proof. Instead, she primarily discredited Carey’s testimony by
comparing it to the testimony of other witnesses and other evidence in the
record.
 IV.  The Prejudice Issue.
 In a case based on alleged ineffectiveness of trial counsel, a
defendant must establish more than a breach of duty on the part of his
counsel. Even if we assume in Carey’s case that his attorney failed to
challenge the prosecutor’s acts of misconduct, that alone is insufficient
to set aside the judgment. The Supreme Court has said that

 [a]n error by counsel, even if professionally unreasonable, does
 not warrant setting aside the judgment of a criminal proceeding if the
 error had no effect on the judgment. . . . [Therefore], any
 deficiencies in counsel’s performance must be prejudicial to the
 defense in order to constitute ineffective assistance under the
 Constitution.

Strickland v. Washington, 466 U.S. 668, 691-92, 104 S. Ct. 2052, 2066-67,
80 L. Ed. 2d 674, 696 (1984).
 The test for prejudice “finds its roots” in a test for materiality of
government-withheld evidence. Therefore, to prevail on an ineffective-
assistance-of-counsel claim,

 [t]he defendant must show that there is a reasonable probability that,
 but for counsel’s unprofessional errors, the result of the proceeding
 would have been different. A reasonable probability is a probability
 sufficient to undermine confidence in the outcome.

Id. at 694, 104 S. Ct. at 2068, 80 L. Ed. 2d at 698; accord Graves, 668
N.W.2d at 877; Nguyen v. State, 707 N.W.2d 317, 324 (Iowa 2005).
 Carey only raises two instances arising during the evidence portion
of the trial: the “was he lying” question and the prodding of the
defendant to admit he had previously choked his daughter by misstating the
defendant’s direct-examination answers. These isolated incidents, which we
have discussed previously, did not establish pervasiveness. The remainder
of Carey’s allegations of misconduct arose out of the prosecutor’s final
argument, an area in which we have traditionally “cut a little slack” to
prosecuting attorneys. See Greene, 592 N.W.2d at 32. While the
prosecutor’s observations about credibility were sarcastic and probably ill-
considered, they were based on a legitimate view of the evidence. As to
the impact on the central issue, i.e., whether Carey attacked VonMoore in
self-defense, we believe they were minimal.
 The most important factor under the test for prejudice is the
strength of the State’s case. See Greene, 592 N.W.2d at 32 (concluding
that the prosecutor’s misconduct did not prejudice the defendant for many
reasons, but perhaps the most compelling reason was that the state’s case
against the defendant was strong); Anderson, 448 N.W.2d at 34 (noting that
the state’s strong case was “significant” in concluding that the
prosecutor’s misconduct did not prejudice the defendant); see also United
States v. Wilson, 149 F.3d 1298, 1302 (11th Cir. 1998) (stating that one of
the most important factors in determining prejudice is the strength of the
prosecution’s case). Clearly, the stronger the case against the defendant,
the less likely the jury is to look beyond the record. United States v.
Modica, 663 F.2d 1173, 1182 (2d Cir. 1981) (per curiam) (recognizing that
the existence of prejudice often turns on the strength of the government’s
case: “if proof of guilt is strong, then the prejudicial effect of the
comments tends to be deemed insubstantial; if proof of guilt is weak, then
improper statements are more likely to result in reversal”).
 Unlike Graves, the State’s case against Carey was strong. See
Graves, 668 N.W.2d at 877 (“The State’s case in the absence of [Officer]
Steil’s testimony concerning Graves’ admissions was weak.”). Carey
conceded the underlying elements of each crime. The only material dispute
was whether his actions were justified. Carey contends that he was
justified because VonMoore had assaulted him earlier that evening, punching
and kicking him in the head and chest, multiple times, “scrambling” his
head “pretty bad,” and causing a bloody nose and other injuries.
 This version of events cannot be reconciled with any of the other
witnesses’ testimony. For example, Carey’s contention that he was punched
and kicked several times is completely unsupported in the record. The
victim was so drunk he could hardly stand up, according to witnesses
present at the time of the incident. It is highly unlikely he would be
able to inflict the injuries that Carey now attributes to him. The
officers who first arrived at the scene testified that Carey appeared to be
uninjured. The doctor who treated Carey observed no injuries to his head or
body. The doctor testified that the defendant did not complain of any
injuries, and he displayed no outward signs of having been in a fight.
While the defendant asserted that the doctor did not examine him
thoroughly, the doctor said he performed a full examination. In addition,
the officer who accompanied Carey to the hospital testified that he
witnessed the examination, and he thought the doctor was very thorough,
going so far as to require Carey to remove his shirt for examination.
These eyewitness accounts are supported by photographs taken of the
defendant shortly after the incident occurred.
 Given the evidence previously set out in the statement of facts and
the severe inconsistencies in Carey’s testimony, the State’s case against
Carey was overwhelming. The defendant, in fact, admitted every material
element of the crimes with which he was charged; the State only bore the
burden of proving that the defendant was not justified in his actions. We
believe the record shows that the State met that burden.
 In this case, the prosecutor clearly committed several acts of
questionable conduct, and we admonish her to be more professional and
constrained in future cases. Nevertheless, any alleged misconduct did not
cause prejudice to the defendant sufficient to require a new trial. Most
of the instances were not severe and did not relate to significant aspects
of the trial. Most importantly, the State’s evidence was extremely strong.
 Given these circumstances, it is not “reasonably probable” that, “but for
counsel’s unprofessional errors, the result of the proceeding would have
been different.” Strickland, 466 U.S. at 694, 104 S. Ct. at 2068, 80
L. Ed. 2d at 698.
 Because we find the defendant has failed to establish prejudice, we
reject his ineffective-assistance claim and affirm his conviction.
 DECISION OF COURT OF APPEALS AND JUDGMENT OF DISTRICT COURT AFFIRMED.