# IN THE COURT OF APPEALS OF IOWA

No. 17-1035
Filed November 7, 2018

**STATE OF IOWA,**
         Plaintiff-Appellee,

**vs.**

**RICHARD RYAN LAMB CARSON,**
         Defendant-Appellant.
_____

         Appeal from the Iowa District Court for Clarke County, John D. Lloyd, Judge.


         Defendant appeals conviction and sentencing of two counts of first-degree murder based on his denial of fair trial due to prosecutorial error and ineffective assistance of counsel.  **AFFIRMED**.


         Mark C. Smith, State Appellate Defender, and Brenda J. Gohr, Assistant Appellate Defender, for appellant.

         Thomas J. Miller, Attorney General, and Sharon K. Hall, Assistant Attorney General, for appellee.


         Heard by Vogel, P.J., and Vaitheswaran and McDonald, JJ.

**VOGEL, Presiding Judge.**

A jury found Richard Ryan Lamb Carson guilty of two counts of first-degree murder. Carson appeals his convictions and sentence after the district court denied his motion for a mistrial. He claims the prosecutor made multiple comments during closing arguments that denied him the right to a fair trial. He further asserts his counsel provided ineffective assistance by failing to object to the prosecutor's questions during cross-examination. Because the prosecutor's comments did not prejudice Carson, the district court did not abuse its discretion in denying Carson's motion for mistrial. We preserve the issue of ineffective assistance of counsel for possible postconviction relief.

## I. Background Facts and Proceedings

The jury could have reasonably found the following facts. On January 23, 2015, Carson and his girlfriend, Tracy Johnson, went to the home of Chris Elben and Lynn Sutton for dinner. Elben's niece, Victoria Byers, was staying at the home and was also present that evening. Two of Byers's friends, Noe Flores and Erick Reyna, came to the home to go out with her that night. According to Byers, Flores entered the home and told her that he would wait in the car until she was ready to leave. Flores went back outside where he and Reyna waited in a black Honda that was parked in the driveway.

Carson left the home for a brief period while Byers prepared to go out with Flores and Reyna; when he came back, he told Johnson that he had "kicked somebody's ass and he didn't know what to do."[1] Carson and Elben then left the

---

[1] Byers later testified Carson said, "I just beat the f**k out of that Mexican."

home together. Later that evening, Sutton received a phone call from Elben indicating that he and Carson needed a ride.[2] Johnson and Sutton drove Carson's truck to a house in the country and picked up the two men. The group briefly returned to the Elben/Sutton house before they went to Carson's mother's home. At the mother's home, the two men went to the bathroom where they threw their clothes and shoes in a trash bag, showered, and washed their hands and a gun with bleach. Johnson heard Carson "talk[ing] about shooting one of them in the head and describing that it smelled terrible." Johnson and Carson then returned to Johnson's apartment.

On January 25, while Johnson and Carson were watching television at Johnson's apartment, Carson said he thought someone was outside with a gun. After Carson asked Johnson if there was a storm drain nearby, he went to the bedroom and returned with a gun. She had seen him with that gun before the events of January 23. He put the gun in his pants and left the apartment. Later that night, law enforcement found Flores and Reyna dead from gunshot wounds. The bodies were inside a black Honda, which was located on the property of Carson's former mother-in-law. The next day, law enforcement found the gun Carson had in Johnson's apartment in a storm drain one-half block from the apartment.

Carson testified and admitted to having shot Flores and Reyna but claimed he did so in self-defense. His version of the events on the evening of January 23 began when he went outside the Elben/Sutton home to retrieve a pack of

---

[2] Machelle and Bernard Critz testified they allowed Carson and Elben to use their phone that night and then someone arrived to give them a ride.

cigarettes. Seeing the parked Honda, he knocked on the rear driver's side window to ask if someone had a lighter. A voice from inside the car told him to come to the front passenger's side. When he walked around the car, the window rolled down and the passenger pointed a gun at Carson. The passenger said, "I've got you now," and fired a shot that missed Carson. Carson testified he grabbed the firearm, twisted it free from the passenger's hand, and fired two shots at the passenger's head. He then saw the driver reach for a short barrel revolver, so he fired two more shots at the driver. With the driver still moving, Carson fired one more shot, "center mass on his body," after which the driver went into convulsions, dropped his firearm, and slumped over the steering wheel.

According to Carson's testimony, he was scared and shaking after the shootings. He wiped off the gun and dropped it back into the car. The gun landed on metal, and Carson discovered a large automatic pistol and a magazine clip in the passenger's lap. After a few minutes, he went back into the house and declared, "I f**ked a couple of guys up."[3] He pulled Elben aside and said, "A couple guys just tried to kill me. . . . I shot them. . . . I took one of the guns away from them and I fired back." When he and Elben went outside, he claimed the Honda had disappeared.

After the May 1 to May 4, 2017 jury trial, Carson was found guilty of two counts of first-degree murder, class "A" felonies, for which two consecutive life sentences were imposed. He appeals.

---

[3] His testimony varied only slightly as to how he phrased his statements that he blurted out to the people in the house.

## II. Standard of Review

We review denials of mistrials and prosecutorial error claims for abuse of discretion. *State v. Plain*, 898 N.W.2d 801, 810–11 (Iowa 2017). "An abuse of discretion will only be found when a court acts on grounds clearly untenable or to an extent clearly unreasonable." *State v. Leckington*, 713 N.W.2d 208, 216 (Iowa 2006).

We review ineffective-assistance-of-counsel claims de novo. *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006). "If an ineffective-assistance-of-counsel claim is raised on direct appeal from the criminal proceedings, we may decide the record is adequate to decide the claim or may choose to preserve the claim for postconviction proceedings." *Id.* (citing Iowa Code § 814.7(3) (2005)).

## III. Denial of Motion for Mistrial; Prosecutorial Error[4]

Carson asserts he was denied a fair trial due to prosecutorial error that occurred during the trial. "Prosecutors have a dual function. They must prosecute with vigor and diligence, and, at the same time, be alert to assure the defendant a fair trial." *State v. Webb*, 244 N.W.2d 332, 333 (Iowa 1976). "In order to establish a violation of the right to a fair trial, a defendant must show both (1) error or misconduct and (2) prejudice." *Plain*, 898 N.W.2d at 818. Carson points to three situations where prosecutorial error allegedly occurred during closing argument:

---

[4] In *State v. Schlitter*, the Iowa Supreme Court distinguished the terms "prosecutorial misconduct" and "prosecutorial error." 881 N.W.2d 380, 393–94 (Iowa 2016). The court held "[p]rosecutorial error occurs where the prosecutor exercises poor judgment and where the attorney made a mistake based on excusable human error, despite the attorney's use of reasonable care." *Id.* at 394 (internal quotations and quotation marks omitted). Prior cases are cited with references to "prosecutorial misconduct"; however, for the purposes of this opinion, this phrase should be interpreted to mean "prosecutorial error."

(1) the prosecutor repeatedly implied Carson was a liar, (2) the prosecutor asked about Carson invoking his right to an attorney, and (3) the prosecutor's use of the term "insanity."

### A. Prosecutorial Error

A prosecutor "is entitled to some latitude during closing argument in analyzing evidence admitted in the trial." *State v. Phillips*, 226 N.W.2d 16, 19 (Iowa 1975). "[A] prosecutor may argue the reasonable inferences and conclusions to be drawn from the evidence" but may not "express his or her personal beliefs." *State v. Graves*, 668 N.W.2d 860, 874 (Iowa 2003).

Carson objected to multiple comments from the prosecutor's closing and rebuttal arguments that he argues impliedly called him a liar or were otherwise improper. First, the prosecutor said:

> To be clear, this case is not about insanity. The defendant was evaluated and found competent. . . . That is not what this case is about. His words have been designed to mislead and to draw attention away from the facts. Again, my standing here saying something no matter how outrageous it is, does not mean it is true. He makes these outrageous claims, but they're mostly designed to keep him from being held accountable.

Carson argues this comment raised the issue of competency to "improperly cause the jury to draw the inference that the defendant was a liar." Competency was first discussed during cross-examination after Carson struggled to answer the prosecutor's questions:

> Q. Okay. Tracy Johnson was your girlfriend? A. Yes, she was.
> Q. You were living with her? A. I was staying part time at my mother's—Marjorie—house, and then I would stay over at her house once in a while.
> But I had my oldest boy, Colton. He was right around fifteen years old. When he hit about fourteen or fifteen, him and his mom

started bumping heads. I don't have forty-nine percent custody now because he turned eighteen years old on the twenty-seventh of this last month, but I had forty-nine percent custody of him and his mom had fifty-one percent custody, and they were bumping heads, so he was staying with me and my mother and going to school.

Q. My question to you: Tracy Johnson, you were pretty much living with her, and she was your girlfriend? A. I didn't live with her full time. I stayed there off and on.

Q. Let's be clear about something. You have been evaluated and found to be competent to stand trial; correct? A. I had to fight to do that.

Q. And so you have been evaluated and found competent? A. I took—

Q. Is that a yes? A. Yes, it is.

Carson had issues directly answering the questions throughout his entire testimony. The court even admonished him to only answer the questions or his testimony would be stricken:

Mr. Carson, let me make this suggestion to you.

If you don't want your entire testimony stricken from this record, you will answer counsel's questions. And you will answer them, and then you will quit talking, and you will not ask counsel questions.

But if you keep going the way you are, your version of this event is going to be stricken from this record.

You are capable of listening to the question and answering it. Please do so.

Defense counsel attempted to explain Carson's testimony, by providing the following commentary:

He is a poor advocate for himself. He doesn't talk—and I don't mean to be unkind—but he doesn't talk the way we talk in court. He doesn't relate to others the way we relate to each other in court.

And, again, I don't want to be unkind, and I certainly hope I'm not. It's just the way that he is. He has beliefs, and he expresses them, and I guess the best example is the Judge reminding him to answer the question and then shut up. That's how we do things in court. We ask questions, we give answers, and we shut up. He doesn't speak that way, okay? But take that into account when you analyze his testimony.

Outside the presence of the jury, the prosecutor stated her comment was meant to provide guidance to the jury. She stated the jury has "no way of knowing that [the insanity defense] has to be affirmatively brought up by the defense before that can be considered. Given the defendant's testimony and actions . . . , I think it was a valid argument, and it certainly needed to be addressed." The court then found the prosecutor's statement "reiterated what was part of the record"; while "[i]t may have been unfortunate that at some point [the prosecutor] used the word 'insanity,'" the usage was not "particularly meaningful" as part of the argument.

Second, the prosecutor stated during closing arguments:

Is he telling you the truth that that's not his gun, and if he's not, why not? Because, gosh, that certainly makes his story to you about self-defense seem more ridiculous.

The jury instructions are going to tell you that you can disregard any or all of Carson's testimony if you find him untruthful. That's your determination, ladies and gentlemen, but you get to use your common sense. And if he is not telling you the truth, you don't have to believe this idea that there was anything to do with self-defense. It's not a defense if you make it up. Self-defense is there for those times that it is true, not for those times that you come in and make it up. Let's see how his claim matches up with common sense.

Carson argues this comment improperly implied that he lied because his testimony was based on his version of the killings. The State notes Carson's version of the events differed greatly with numerous witnesses, including Tracy Johnson, Victoria Byers, Officer Michael Cody Smith, and Machelle and Bernard Critz. The State argues the prosecutor's statement was an attempt to instruct the jury to consider the different versions of events and decide which it believed to be true.

Third, the prosecutor stated:

> And Carson goes outside, has this happen, kills these men, and fails to call the police after shooting them, okay? He takes the car and he hides it on an abandoned property, a property he has ties to.
>
> Now, he claims this is all part of this setup, but let's really think about that for a moment. He knows it is gated. He knows it is remote, and that's where he takes the bodies. Self-defense? You have to kill two men because they have just tried to do something to you, and you go and you hide their bodies? He tries to spin a tale for the police.

Carson made an objection, which the court overruled but warned the prosecutor not to go further. The prosecutor continued with her closing argument:

> What he tells the police is that he goes outside and there's a shoving match and these two men leave. Now, he tries to tell you now, "I only said that because I was only testing the cops. I was trying to find out what they knew." Sounds like a person that was validly interested in letting them know that this was self-defense?
>
> Do you test the cops to see what they know before you tell them the truth? Or better yet, "Well, they lied to me so I get to lie to them."

Outside the presence of the jury, defense counsel argued the prosecutor essentially called Carson a liar with this comment. The prosecutor replied, "I did not call him a liar, which is actually what *Graves* said. He did spin a tale. We have evidence to show that. That's for the jury to decide and I believe I made that clear." The district court found a "single phrase in the context of the entire argument does not implicate, on the part of the State, to grant or call the Defendant a liar, or to make any kind of inflammatory comments about the Defendant's credibility that the Appellate Courts in Iowa have found to be improper." The State argues to us that the prosecutor's comment calls attention to Carson's own admission of his untruthfulness in an interview with law enforcement. Carson admitted he did not tell law enforcement the truth in the initial interviews because he was "feeling the cops out to see what they had on [him]."

Fourth, when discussing Carson's trial testimony about his police interview, the prosecutor stated during closing argument, "His story doesn't work so then he tries to get into they had a gun, but when he's questioned, he stops. I don't want to answer any more questions." Carson argues this comment improperly referred to his earlier testimony about ending the police interview.

Carson provided the following testimony during his cross-examination:

> Q. You would agree with me that you did not tell the police in your first interview that they ever fired a gun at you; correct? A. No. My first interview was with DCI, and I did say that they fired the gun, that it went off, and I turned the gun on them, and that they got hurt, and it was self-defense is what I said in my first interview. So where all of the parts that says unintelligible in [the interview transcript], they couldn't hear the tape. You have all these unintelligibles. That's pretty convenient.
> . . . .
> Q. You would agree, sir, that does not show up in the transcript? A. I understand that, but running a magnet over that tape will take that off of there too.
> Q. Okay. So you ended that police interview; correct? A. Yes, I did.
> Q. All right. And you ended it yourself? A. Yes, I did.
> Q. When they started questioning you about this self-defense that you say you talked about in the unintelligible portion of your statement— A. I said they pulled a gun, it went off, and they got hurt, and it was self-defense, and my friends and family didn't see it and weren't involved in it, and it was just me and those two guys outside.
> Q. And when they started to question you on— A. Once that was said—once that was said, I said I wanted a lawyer. I said I want a lawyer.
> THE COURT: That's all you need to say, Mr. Carson. Next question, [prosecutor].

Outside the presence of the jury, the prosecutor provided the following rationalization for her comment on the interview during her closing argument:

> The defendant ended the conversation with the police when they started to question him about [the] second version of events. It's a fair comment on how that ended . . . . I did not talk about his asking for a lawyer. I didn't ask him if he asked for a lawyer in testimony. I simply asked him if he stopped the testimony—stopped the

questioning, and that's when he volunteered the information about the lawyer.  Again, I commented on something that is in evidence.

The court then largely agreed with the prosecutor:

Defendant was asked something about explaining to the police what was going on, and he volunteered—that he decided to quit talking so he could ask for a lawyer.  That was not elicited by the question.  It was consistent with the defendant's pattern of being particularly responsive to the questions he was asked, and it is in the record because of his voluntary statement.

Beyond that, the closing argument of counsel did not mention the request for counsel.  It just simply said he ended the interview.  That is factually accurate and is part of the record, and I don't believe in the context of the argument that it conflicts with the defendant's assertions of his constitutional rights.

Fifth, the prosecutor said during her rebuttal argument without objection:

I bring this up . . . these unanswered questions because those are the things we talked about in jury selection.  I can't always have an answer for you for everything.
. . . .
Oh, but the State couldn't tell you why he did it.  Nope.  I can't tell you why he sat on this stand and said two officers drove up and looked at him and give him a look like, "I'm sorry you lived through this."  Really?  Does anybody here believe that's what happened?  We will probably never know why he did it.  And, you know what, there's not a single jury instruction that tells you we need to.  And do you know why that is?  Because we know you can't really always rely on somebody that murders another person to tell you the truth.

Carson claims this comment improperly implied he was a murderer and a liar.

However, the prosecutor repeatedly reminded the jury it was their job to decide

who was telling the truth.  For example, the prosecutor told the jury:

The crime scene tells you all of Carson's stories are incorrect, and common sense tells you that there was no self-defense.
And, again, I'm going to stress there are a lot of jury instructions on self-defense.  You don't even get to them if you don't believe this is self-defense.  You don't have to go through, well, was it justified, or was it that he reasonably believed, or whatever.  If you think he's telling you a lie about that, you decide that.  I'm not saying whether he is or not.  That's your job.

Carson argues all of these comments constitute prosecutorial error. Moreover, he argues he is entitled to a new trial because of these errors. Even assuming these comments amount to prosecutorial error, Carson must also demonstrate he was prejudiced by the comments.

## B. Prejudice

If we were to disagree with the district court's ruling on the motion for mistrial and find prosecutorial error transpired, we also need to analyze whether Carson was prejudiced by any such error. "The grant of a new trial based on prosecutorial misconduct does not hinge on the misconduct, but the resulting prejudice which prevents the trial from being fair." *State v. Escobedo*, 573 N.W.2d 271, 278–79 (Iowa Ct. App. 1997). "Trial courts have broad discretion to determine whether prejudice resulted from misconduct. As a firsthand observer to both the claimed misconduct and any reaction by the jury, the trial court is better equipped than an appellate court to determine the presence of prejudice." *Id.* at 277. To determine whether prejudice has occurred, we consider the following factors: "(1) the severity and pervasiveness of the misconduct; (2) the significance of the misconduct to the central issues in the case; (3) the strength of the State's evidence; (4) the use of cautionary instructions or other curative measures; and (5) the extent to which the defense invited the misconduct." *Graves*, 668 N.W.2d at 877.

### 1. Severity and Pervasiveness of Error

Carson argues the error was severe and pervasive because it began during his cross-examination and continued in the closing argument. It is important to remember the prosecutor's closing argument is not considered evidence and the jury was so instructed. *See Plain*, 898 N.W.2d at 821 (finding the error of using

the term "victim" instead of "alleged victim" was not prejudicial because the use was limited to closing arguments and any potential prejudicial effect was mitigated by the district court's instructions that closing arguments are not evidence). During voir dire, the court advised the jury that "[a]ny statements that the attorneys may make . . . during jury selection, opening statement, or closing argument are not evidence and their statements should not be considered by [the jury] as evidence." Before closing arguments commenced, the court told the jury the closing arguments "are not evidence, and they should not be construed by you as evidence, and they are not instructions on the law of this case." Additionally, jury instruction number five specified what evidence the jury could base the verdict on. The instruction also specified what was not considered evidence, which included "[s]tatements, arguments, questions and comments by the lawyers."

The prosecutor's comments were made in her closing argument, and the district court found the comments minor when assessing the entire argument and the entire record evidence. Since these comments were not considered evidence, the prosecutor's central theme was not calling Carson a liar but recalling how his testimony varied in stark contrast from all the other witnesses' testimony. *See State v. Coleman*, 907 N.W.2d 124, 141 (Iowa 2018). Moreover, not all of these comments were directed at the credibility of Carson's testimony during trial. For example, the statement about him "spin[ning] a tale" was in reference to the police interview where he admitted he did not tell law enforcement everything because he was trying to "feel them out." Moreover, any potential prejudicial effect was mitigated by the district court's instructions to the jury. *See Plain*, 898 N.W.2d at 821.

### 2. Significance of the Error to the Central Issues

Carson argues the central issue in the case, self-defense, requires the jury to find his testimony credible, which rested on his perception of the events. Thus, we agree the central issue of his defense depends on the jury finding his testimony credible and any comment on his veracity would be significant to this issue.

### 3. Strength of State's Evidence

"The most important factor under the test for prejudice is the strength of the State's case." *State v. Carey*, 709 N.W.2d 547, 559 (Iowa 2006). Thus, "the stronger the case against the defendant, the less likely the jury is to look beyond the record." *Id.* Carson argues that the State's evidence was weak because there were no eyewitnesses to the shooting and the lack of gunshot residue on his body does not rebut his testimony of self-defense.

In *Carey*, the court found the State's case was "overwhelming" because the defendant conceded to the elements of the crime and there were "inconsistencies in [his] testimony." *Id.* at 559–60. Here, Carson admitted to shooting both men but claimed he acted in self-defense after the passenger shot at Carson and the driver reached for a gun. He asserts that the gun he used belonged to the men and there were a total of three guns in the Honda. However, law enforcement found no guns in the Honda, law enforcement found the specific gun used to kill the men in a storm drain near Johnson's apartment, and Johnson testified Carson had possession of the specific gun prior to the killings. Carson asserts he does not know how the Honda was moved from the Elben/Sutton residence to his ex-mother-in-law's abandoned property. Johnson testified about picking up Elben and Carson from a house in the country after Sutton received a phone call from Elben.

Bernard and Machelle Critz testified that Elben used their phone to call for a ride after claiming he and Carson had car trouble. Johnson also testified that after picking up the men, they went to Carson's mother's home where the two men showered, washed their hands and the gun with bleach, and put their clothes and shoes in a trash bag. Based on this evidence, the State's case is strong. *See id*. at 559–60.

### 4. Use of Curative Measures

Carson asserts that the standard cautionary instruction was insufficient to provide curative measures and the district court failed to provide an adequate instruction. In *Graves*, no specific instruction was provided and the court suspected this was due to defense counsel's lack of objection. *Graves*, 668 N.W.2d at 878. Conversely, in this case, the district court specifically ruled on a special instruction after defense counsel made a request and stated "any instruction that would be given would unduly emphasize to the jury . . . or potentially call to the jury's attention matters that they shouldn't be considering, and . . . an instruction would do more harm than any good it could possible do." We agree with the district court.

### 5. Extent to Which Defense Invited the Error

Finally, Carson argues the defense did not invite the error because his counsel did not comment on his truthfulness. It is true the defense did not make any direct comment about Carson telling the truth, however, a central issue in this case was whether Carson's version of events occurred. If a jury found his version of events plausible, then self-defense could justify the killings of Flores and Reyna. However, testimony from numerous witnesses contradicted Carson. While the

defense did not specifically "invite" comments about Carson's veracity, the contradicting testimony provided a fair inference of lying. *See id.* at 875.

### 6. Conclusion

Even assuming the prosecutor's comments constitute error, Carson has failed to demonstrate he was prejudiced by such error and should be awarded a new trial. As previously stated, the strength of the State's case is typically considered the most important factor. *See Carey*, 709 N.W.2d at 560. The State had a strong case against Carson. In addition, the alleged errors were limited to the closing arguments and any potential prejudicial effect was mitigated by the district court's instructions to the jury that closing arguments are not to be considered as evidence. *See Plain*, 898 N.W.2d at 821. We find the district court did not abuse its discretion by dismissing the motion for mistrial.

### IV. Ineffective Assistance of Counsel

Carson alleges that his counsel was ineffective by failing to object to the prosecutor's question about competency and the question about the termination of the police interview. "Even a lawyer is entitled to his day in court, especially when his professional reputation is impugned." *State v. Coil*, 264 N.W.2d 293, 296 (Iowa 1978). Therefore, we preserve this issue for possible postconviction relief, "where a full evidentiary hearing may be had and where counsel will have an opportunity to respond to defendant's charges." *Id.*

**V.  Conclusion**

We conclude the defendant was not prejudiced by the prosecutor's comments.  Additionally, we preserve the issue of ineffective assistance of counsel for possible postconviction relief.

**AFFIRMED**.

McDonald, J., concurs; Vaitheswaran, J., specially concurs.

**VAITHESWARAN, Judge.** (concurring specially)

I specially concur. "[W]hile a prosecutor is properly an advocate for the State within the bounds of the law, the prosecutor's primary interest should be to see that justice is done, not to obtain a conviction." *State v. Graves*, 668 N.W.2d 860, 870 (Iowa 2003). "In addition, the prosecutor is not allowed to make inflammatory or prejudicial statements regarding a defendant in a criminal action." *Id.* at 874 (citation and internal quotations omitted). Nor may a prosecutor "unfairly disparage the defendant in an effort to inflame the passions of the jury." *Id.* at 875. I believe the State lost sight of these signature principles.

I am particularly troubled by the State's comment during rebuttal closing argument that "you can't really always rely on somebody that murders another person to tell you the truth." If it is improper to use the term "victim" during closing argument, as the Iowa Supreme Court found in *State v. Plain*, 898 N.W.2d 801, 820 (Iowa 2017), then it must be improper to refer to a defendant as a murderer. And if it is "improper for a prosecutor to call the defendant a liar, to state the defendant is lying, or to make similar disparaging comments," as the court found in *Graves*, 668 N.W.2d at 876, surely it must be improper to refer to a "murderer's" inability to tell the truth.

True, the State tied some of the comments to the evidence. But the State did not "limit [the] argument to a discussion of whose testimony was most believable based on reasonable inferences from the evidence." Instead, the State resorted "to inflammatory characterizations of the defendant's testimony." *Graves*, 668 N.W.2d at 876. Consider the following statements: (1) "It's not a defense if you make it up. Self-defense is there for those times that it is true, not for those

times that you come in and make it up."; (2) "[G]osh, that certainly makes his story to you about self-defense seem even more ridiculous . . . ."; (3) "[M]y standing here saying something no matter how outrageous it is, does not mean it is true . . . ."; (4) "He makes these outrageous claims, but they're mostly designed to keep him from being held accountable . . . ."; and (5) "'Well, they lied to me so I get to lie to them.' Neener neener. Two dead bodies, but they lied to me so I get to lie to them." Intentional or not, these statements, in my view, violated *Graves*.

That said, Carson's claim requires a showing of prejudice. *Id.* at 877–80. I would conclude Carson's credibility was critical to his self-defense theory, Carson did not invite the State's comments impugning his credibility, the State's commentary permeated its closing arguments, and the cautionary instructions "were only those routinely given in criminal trials." *Id.* But, unlike *Graves*, the State's evidence was exceptionally strong. *Id.* at 877. Given the strength of the evidence, I agree Carson was not entitled to a new trial.