STATE of Iowa, Appellee,

v.

Bernice HAHN, Appellant.

No. 59182.

Supreme Court of Iowa.

Nov. 23, 1977.

**754**

Robert E. Mahan and William C. Ball, Waterloo, for appellant.

Richard C. Turner, Atty. Gen., Jim P. Robbins, Asst. Atty. Gen. and David H. Correll, County Atty., for appellee.

HARRIS, Justice.

This appeal is from a second-degree murder conviction. Bernice Hahn (defendant) was convicted for the shooting death of her husband at the couple's home January 10, 1975. Because of private communications between the trial judge and a juror we reverse and remand the case for a new trial.

It is not disputed defendant's husband, Donald Hahn, died as the result of a gunshot blast fired by defendant. Neither is it disputed that defendant had been severely beaten by her husband just prior to the shooting. The record clearly reveals during the couple's 30 year marriage defendant was increasingly a prisoner of her husband's violent rages during which she frequently had been severely beaten. She had been hospitalized at least once as the result of a beating and a number of times for emotional and mental illnesses. Decedent had a drinking problem. The severity and frequency of the beatings, defendant's emotional problems, and decedent's drinking problem all worsened with the passage of time.

At the time of the shooting the couple resided in an apartment in Cedar Falls. Their children had grown up and moved away. Defendant had held employment out of the home only briefly during the marriage. She quit outside employment to satisfy the wishes of decedent. Because defendant did not know how to drive an automobile the couple customarily arranged to do the weekly wash at a coin-operated laundry each Friday morning.

Before leaving for the laundry at 8:00 a. m. decedent drank an alcoholic beverage in the apartment. Also before leaving defendant prepared decedent's dinner so it would be ready for him when they returned. Thereafter decedent drove defendant to the laundry and left her to attend the cleaning and folding of the clothes while he went to a bar. After completing her work she waited until decedent returned.

The couple then together went to two bars where they each consumed several drinks. Thereafter they shopped at a local grocery store and later went to a liquor store where decedent purchased the two half gallons of whiskey he expected to consume during the week. At decedent's direction defendant mixed him a drink in the car as they drove back to the apartment.

When the couple returned home defendant immediately continued her preparation of decedent's dinner. She continued the preparation even while conversing by phone with a daughter-in-law. The couple's son had planned to visit. Such visits, for some reason, habitually caused decedent to become violently irritable. The call seemed to infuriate decedent and he began to complain about the meal. When the complaints continued defendant told him he should get one of his other women to work for him. Decedent flew into a rage and threw his tray of food at defendant and started beating her.

He beat her head against the wall and threw her to the floor. Repeatedly, when defendant tried to use the telephone, decedent continued the beating and eventually threw her down on the couch in the living room. Several times she tried to bolt for the front door but he threw her down.

After a period of a few minutes defendant asked if she could get a washcloth and wash her swelling lip. Decedent allowed her to do so. After washing her lip defendant went to the bedroom, took her shotgun out of its case, loaded it, and then cocked it

loudly enough so decedent knew what she was doing.

She returned to the living room where decedent was sitting in a reclining chair and pointed the gun at him and stated, "You threatened to kill me, now I will you." At this show of force decedent sneered and said, "You haven't got the guts."

The only serious factual dispute is whether decedent at this point started to get up in a threatening manner. At trial defendant testified he did. The State's showing that decedent remained seated was based on a statement to that effect defendant gave officers immediately after the shooting. Of course we are bound to take the evidence in the light most consistent with the verdict and conclude decedent remained seated.

There is no dispute defendant then shot her husband and thereafter ran to the neighbors who called the police and summoned an ambulance. She explained to investigating officers, "He beat me so I shot him." As indicated, decedent died from internal injuries caused by the gunshot wound.

Defendant was tried for murder in violation of § 690.1, The Code, and was convicted of second-degree murder (§ 690.3, The Code). In her appeal she raises 12 assignments of error. For reasons which will appear it is unnecessary to consider all 12.

I. Two of defendant's assignments of error relate to private judge-juror conversations and the claimed effect of such conversations on jury deliberations. Taken together the assignments require reversal and a new trial.

During a trial recess a conversation took place between the trial judge and Craig Caslavka, a juror who later served as foreman. The conversation was initiated by the judge at a time when Caslavka was seated with other jurors in the jury box. The judge asked Caslavka to step aside for a moment. Other jurors seated in the jury box apparently saw and heard the request.

The judge and Caslavka then stepped out into the hall where the private conversation took place. The judge's purpose in initiating the conversation was to learn whether Caslavka was related to another person named Caslavka who was then on trial for murder in Linn County, Iowa. The judge was interested in learning from Caslavka whether or not he could be a fair and impartial juror in this case if he were indeed so related.

Apparently Caslavka told the judge he was a brother of the defendant in the Linn County case but this fact would not impair his ability to be fair and impartial as a juror in the instant case.

Counsel for the State and for the defendant were not invited to participate in this private conversation and were not aware of it at any time during the trial. The conversation was not reported.

Another conversation, perhaps two more, between the trial judge and Caslavka took place in the Elk's Club in Waterloo, where both took their meals. Apparently conversations at the Elk's Club consisted only of the exchange of pleasantries. But another juror testified Caslavka reported to the jurors that he had had a nice chat with the judge but not about the case. One of the jurors believed the judge and foreman had taken their meal together.

During the second day of deliberations the jury went to lunch and resumed deliberations at 1:00 p. m. During the process of deliberations Caslavka told the other jurors, "I know Judge Degnan and he hates hung juries. He will let you hang for days if you don't make a decision."

The State believes error on these assignments was not preserved because not raised until after trial. In overruling the motion for new trial the trial court did not indicate such conversations did not occur. Rather, it noted discussions with counsel about Caslavka's brother and the latter's trial for murder. The trial court noted there had been no request for a record or for substitution of jurors.

Pursuant to § 786.4, The Code, defendant filed an unsigned bill of exceptions noting the informal discussion referred to by the

trial court. But the bill of exceptions further noted defendant had not been advised at any time during the trial that the trial judge had conversed with the juror Craig Caslavka. The trial court refused to sign defendant's bill of exceptions.

Such a refusal would ordinarily render the bill insufficient to show what transpired. *State v. Horsey*, 180 N.W.2d 459, 461 (Iowa 1970) and authorities. However we are unable to find from the trial court's holding that counsel were advised of the judge's private conversation prior to the end of trial. Because we are as concerned with the *fact* of any judge-juror conversation as with the *content* of any such conversation we conclude the assignments should be entertained. See *State v. Blackwell*, 238 N.W.2d 131, 134–136 (Iowa 1976); *State v. Cowman*, 212 N.W.2d 420, 425–426 (Iowa 1973).

Section 777.19, The Code, provides: "If a felony is charged, the defendant must be personally present at the trial * * *." In *Blackwell*, supra, 238 N.W.2d at 134–136, we held a defendant has a constitutionally protected right to be present whenever the court communicates with a juror as to his impartiality. See also *Illinois v. Allen*, 397 U.S. 337, 338, 90 S.Ct. 1057, 1058, 25 L.Ed.2d 353, 356 (1970); *Shields v. United States*, 273 U.S. 583, 587–588, 47 S.Ct. 478, 479, 71 L.Ed. 787, 789 (1927). In *Maier v. Illinois Central Railroad Company*, 234 N.W.2d 388, 395 (Iowa 1975) we said:

" * * * Few occurrences *during trial or deliberations* are quite so likely to cause reversal as a private communication between anyone, including a judge, and a juror. *State v. Register*, 253 Iowa 495, 504–505, 112 N.W.2d 648, 653 (1962); *Daniels v. Bloomquist*, 258 Iowa 301, 306–307, 138 N.W.2d 868, 872 (1965); *State v. Grady*, 183 N.W.2d 707 (Iowa 1971); *State v. Snyder*, 223 N.W.2d 217, 221–222 (Iowa 1974); 75 Am.Jur.2d, Trial, § 1001, pages 842–844; 89 C.J.S. Trial § 473, pages 115–117." (Emphasis added.)

In *Blackwell* we held the complete record made of the judge-juror communications revealed there was no reasonable possibility of prejudice and, hence, defendant's absence during the communications was harmless error. It is urged we should reach the same conclusion in the instant case. But here we cannot say there was no possibility of prejudice.

We are obliged to ignore statements or affidavits of jurors as to whether the communications influenced their verdict. The principle is well settled a juror may not by affidavit or testimony state what influenced the jury in reaching its verdict. *State v. Berch*, 222 N.W.2d 741, 747–748 (Iowa 1974).

Evidence of defendant's guilt was not overwhelming. There was a conflict between defendant's trial testimony and the taped statement she gave to arresting officers. But the two statements differed only in one important respect: whether decedent remained seated when shot. If the jury accepted defendant's trial testimony they might well have acquitted her. This is especially true in view of the testimony of neighbors who heard the altercation. The jury might well have believed defendant secured the weapon in question only in order to escape another beating from decedent.

In any event the improper judge-juror conversations may well have caused vacillating jurors to accede to a conviction of second-degree murder rather than to a conviction of the lesser included offense of manslaughter.

Although the exchange of pleasantries between judge and juror is not necessarily error, see commentary ABA Standards Relating to the Function of the Trial Judge, § 5.2(b), the Elk's Club conversations, taken together with the courthouse conversation, were error. Because it is impossible for us to find there was no reasonable possibility prejudice resulted from the conversations the judgment of the trial court must be reversed.

■ II. Among defendant's other assignments are various other questions which may recur upon retrial. Defendant contends the statements taken in the tape-

recorded interview should have been suppressed and not admitted at trial. She believes the statements were taken in violation of her "*Miranda*" rights. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Defendant freely concedes she was given her *Miranda* warnings but argues she lacked mental capacity to understand their meaning. She believes she was unable to make a knowing waiver of her right to remain silent because her lack of mental capacity rendered the statements involuntary and inadmissible.

The burden is upon the State to prove by a preponderance of evidence defendant's waiver was made knowingly, voluntarily, and intelligently. *State v. Conner*, 241 N.W.2d 447, 454 (Iowa 1976); *Lego v. Twomey*, 404 U.S. 477, 489, 92 S.Ct. 619, 627, 30 L.Ed.2d 618, 627 (1972). We are obliged to make an independent evaluation of the totality of circumstances and determine whether defendant knowingly and intentionally relinquished her right to remain silent. In this evaluation we review the evidence de novo. *State v. Snethen*, 245 N.W.2d 308, 311 (Iowa 1976). Mental weakness, standing alone, does not render defendant's statement inadmissible but is a fact to be considered with all other circumstances shown on the question of admissibility. *State v. Fetters*, 202 N.W.2d 84, 89 (Iowa 1972).

Loras Jaeger, a lieutenant with the Cedar Falls police department, took defendant's statement. Jaeger testified in the suppression hearing that he advised defendant of her constitutional rights at the apartment. At that time defendant told Jaeger she understood those rights. The taped statement was taken at the police station. At the beginning of the 20 minute statement defendant demonstrated an ability to listen and comprehend the questions. She told her name and address, phone number, birth date, and place of birth. She was again given the *Miranda* warnings and again indicated she understood them. Defendant clearly detailed the events surrounding the shooting. In some respects those details were verified by police investigation. Defendant agreed to sign a patient waiver for her husband's operation.

Defendant testified she was especially confused over the meaning of her right against self-incrimination. She supported her testimony with that of Dr. Gerald Strag, a clinical psychologist from Waterloo, who testified of defendant's long history of mental illness. Defendant had been treated by Dr. Strag continually from the day after the shooting. It was Dr. Strag's opinion defendant was unable to appreciate or understand the *Miranda* warnings.

From our de novo review we conclude the State showed by a preponderance of the evidence defendant voluntarily and intelligently waived her right against self-incrimination. We believe it was shown defendant's mental condition did not deprive her of the essential capacity to understand the meaning of the *Miranda* warnings. The taped statement was voluntary and admissible.

▪ III. In another assignment defendant claims she was entitled to a directed verdict of not guilty by reason of insanity. The trial court determined a jury question existed on this defense and instructed the jury of the State's burden to show defendant's sanity beyond a reasonable doubt. *State v. Thomas*, 219 N.W.2d 3, 5 (Iowa 1974).

Defendant's witness, Dr. Strag, testified defendant did not know what she was doing. Dr. Strag believed defendant was not in contact with reality and was suffering from a blackout. On the other hand the State offered testimony of Dr. Lloyd Spencer who also examined defendant. Dr. Spencer testified defendant recognized the difference between right and wrong at the time of the shooting. Sanity was clearly an issue for the jury to decide. *State v. Snethen, supra*, 245 N.W.2d at 316. Defendant's contention to the contrary is without merit.

▪ IV. Defendant contends her motion for directed verdict should have been sustained because the State failed to prove beyond a reasonable doubt she acted with malice aforethought. Malice aforethought

is an element of second-degree murder under § 690.3, The Code. However it may be inferred when an accused uses a deadly weapon. *State v. Smith*, 242 N.W.2d 320, 326 (Iowa 1976). Defendant's motion for directed verdict was properly overruled on this ground.

■■■ V. Defendant separately complains of trial court rulings excluding direct evidence of two psychiatrists regarding the defenses of insanity and diminished responsibility. However there was no offer of proof of what any testimony would be in answer to questions to which objections were sustained. In the absence of an offer of proof we lack an adequate record to review the ruling. *State v. Ritchison*, 223 N.W.2d 207, 213 (Iowa 1974). The ruling of the trial court should also be affirmed because the subject was apparently established by other admitted evidence. *State v. Hicks*, 245 N.W.2d 319, 321 (Iowa 1976). Both of the psychiatrists otherwise expressed an opinion defendant did not know the difference between right or wrong when she shot her husband.

■■■ VI. Defendant also complains of a trial court ruling which limited her cross-examination of Dr. Lloyd Spencer who was called as a rebuttal witness for the State. On cross-examination the witness was asked two questions to which objections were sustained. On appeal defendant contends she should have been allowed to ask the witness whether he had an opinion, based on reasonable medical certainty, as to whether or not defendant was frightened of the decedent. On appeal defendant urges the question should have been allowed as a part of her constitutional right to confront witnesses. She cites various authorities including *Davis v. Alaska*, 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

However the constitutional right of confrontation was not a ground urged at trial. The objection considered and sustained by the trial court was that the question was not a proper subject for expert testimony. The constitutional basis for the objection was not urged until defendant's motion for a new trial. It was therefore too late. See *State v. Pelelo*, 247 N.W.2d 221, 225–226 (Iowa 1976).

Defendant also challenges the trial court ruling limiting Dr. Spencer's cross-examination on the same basis urged at trial. Defendant argues the answer sought by the two questions were a proper subject for expert testimony and that it was an abuse of the trial court's discretion to sustain the objections. The witness's opinion was sought on whether defendant acted out of malice. Another question, as indicated, sought the witness's opinion as to whether defendant acted out of fear.

As to the question inquiring of the witness's opinion of whether malice existed the offer of proof discloses the witness had no such opinion. As to the inquiry of whether the witness believed defendant acted out of fear the record is clear such testimony would have been repetitious of the witness's other testimony in which he answered the question in the affirmative.

On this record there was no prejudice to defendant in the sustaining of the trial court's rulings.

VII. Other assignments urged by defendant are not likely to recur upon the retrial. To discuss them in detail would unduly extend this opinion.

By reason of the matters discussed in division I hereof the judgment of the trial court is reversed and the case remanded for a new trial.

REVERSED AND REMANDED.

All Justices concur except MOORE, C. J., who dissents.

MOORE, Chief Justice (dissenting).

On this appeal defendant assigns 12 alleged errors for reversal. I agree with the majority opinion that 11 of them establish no ground for reversal. However, I disagree and respectfully dissent from the holding, "Because of private communications between the trial judge and a juror we reverse and remand the case for a new trial."

I. This claimed ground for reversal was first raised in defendant's motion for new trial. Evidence in relation thereto was submitted many weeks after the verdict.

The record reveals selection of the jury and two alternates extended over the entire day of May 5, 1975. At 5:20 P.M. the fourteen were sworn "to well and truly try the issues joined in this case, and a true verdict render upon the evidence introduced and in accordance with the instructions of this Court." They were properly released to appear the next morning at 9:00 A.M.

At the hearing on defendant's motion for new trial, defendant's counsel, one of whom had entered his appearance after the verdict, offered the testimony of several members of the jury. Juror Craig Caslavka, a chemist, was examined at rather great length regarding the events of the next morning, May 6. He testified that after the jurors were called and seated in the jury box and everyone else was in the courtroom, Judge Degnan came over and asked him to step down. He did so and then a conversation took place near the courtroom door. He related the Judge inquired concerning his relationship to Greg Caslavka. He stated Greg was his brother who had been tried on a murder charge approximately three years earlier in Linn County. He indicated this would not impair his ability to be a fair and impartial juror. Craig and his family had a strained relationship with Greg. Craig had had no contact with Greg for more than three years previously. He knew nothing about Greg's case. Other jurors testified they observed the Judge and Craig in conversation a short distance from the jury box. They were unaware of what was being said. Thereafter Craig resumed his seat in the jury box and the actual trial commenced. It extended for a period of 10 days.

The motion for new trial alleged the court erred by having the private conversation with juror Caslavka and that counsel had not been given notice prior thereto. In addition to Caslavka's testimony that all were present in the courtroom, it is evident counsel and defendant were in the courtroom prior to the jurors taking their seats. Counsel could observe the incident the same as the jurors.

The obvious purpose of Judge Degnan's visit with Caslavka was to determine whether prior trial of his brother for murder would affect his ability to be fair and impartial—a fundamental aspect of a fair trial. *State v. Cowman*, Iowa, 212 N.W.2d 420, 425.

This is *not* a case where there are indications the trial court by its conduct conveyed a belief in the guilt or innocence of the accused or acted to disparage her in the eyes of the jury. *State v. King*, Iowa, 256 N.W.2d 1; *State v. Larmond*, Iowa, 244 N.W.2d 233; *State v. Kimball*, Iowa, 176 N.W.2d 864. Also see *In re Murchison*, 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942, 946; *Offutt v. United States*, 348 U.S. 11, 17, 75 S.Ct. 11, 15, 99 L.Ed. 11, 18. Nor is this a case where the judge has improperly injected himself into the jury deliberation process. *Maier v. Illinois Central Railroad Company*, Iowa, 234 N.W.2d 388, 395; *State v. Snyder*, Iowa, 223 N.W.2d 217; *State v. Grady*, Iowa, 183 N.W.2d 707; *Daniels v. Bloomquist*, 258 Iowa 301, 138 N.W.2d 868; *State v. Register*, 253 Iowa 495, 112 N.W.2d 648; *State v. Mims*, 306 Minn. 159, 235 N.W.2d 381.

Judge Degnan's ruling on defendant's motion for new trial included:

"The allegations going to the violation of 777.19 of the 1975 Code of Iowa is [sic] misleading. During a recess in the trial the two attorneys for the defendant discussed with the Court informal information that one of the jurors had a brother who was or had been tried for murder. Counsel for the defendant and counsel for the State being so informed did not request to make a record nor have the juror removed in favor of one of the two alternates, nor was there any objection by either party and there appears no basis here for which a new trial should be granted. Defendant's case was not weakened nor were her interests harmed."

Counsel for defendant were apparently not disturbed as they did not ask that an alternate juror be substituted for Caslavka. They refrained from moving for a mistrial because the Judge visited with the juror in their absence and that of defendant. Their conduct clearly indicates a willingness to take a chance on a favorable verdict. Thus they waived the errors now claimed. *State v. Phillips,* Iowa, 226 N.W.2d 16, 19; *Pose v. Roosevelt Hotel Company,* Iowa, 208 N.W.2d 19, 31 and citations.

A party cannot sit by and fail to avail himself of legal procedures to secure a fair trial and later raise the same procedures as grounds for a new trial. *State v. Johnson,* Iowa, 243 N.W.2d 598, 606; *State v. Curtis,* Iowa, 192 N.W.2d 758, 759.

Additionally, a party may not sit by and permit the court to commit inadvertent error without protest and then complain for the first time in a motion for new trial. *State v. Jewett,* Iowa, 219 N.W.2d 559, 560.

In *State v. Youngbear,* Iowa, 203 N.W.2d 274, 278, we state:

"It is sound law and logic that a party may not sit by and permit the court to commit inadvertent error without protest, and then complain for the first time in his motion for a new trial or in the appellate court. *State v. Jensen,* 245 Iowa 1363 at 1371, 66 N.W.2d 480 at 484."

The other conversation which the majority opinion properly describes as an exchange of pleasantries was no more than that. Caslavka, exalted ruler of the Elk's Lodge, testified he saw Judge Degnan in the large Elk's Waterloo dining room two or three times eating lunch with his court reporter or the bailiff. He emphatically denied ever sitting with the Judge or ever making any mention of the case. As pointed out by the majority opinion a mere exchange of pleasantries is not error. Appeal counsel are indeed reaching when they infer improper conduct by the Judge at the Elk's Club.

II. Serious doubt is established in the record as to admissibility of alleged conversations by jurors during their deliberation. When such evidence was offered the assistant county attorney objected to its admissibility and relied on our holding in *State v. Berch,* Iowa, 222 N.W.2d 741, 747, where we state:

"We have repeatedly held trial courts have broad discretion in determining whether evidence of claimed jury misconduct justifies a new trial. *State v. Houston,* 209 N.W.2d 42, 44 (Iowa 1973); *State v. Jackson,* 195 N.W.2d 687 (Iowa 1972).

"In *State v. Brown,* 253 Iowa 658, 671, 113 N.W.2d 286, 294, this court said:

" 'We have frequently held it is not competent to show by statements of jurors what influenced the verdict. That is a matter of opinion which inheres in the verdict. Accordingly it may not be shown in such manner, to avoid the verdict, that a juror did not assent to it, misunderstood the court's instructions or the testimony, was *unduly influenced by statements of fellow jurors,* was mistaken in his calculations or judgment, or other matters resting alone in the juror's breast. These all inhere in the verdict.' (Emphasis supplied.)"

See also *Anderson v. Goodyear Tire & Rubber Company,* Iowa, 259 N.W.2d 814, (Filed November 23, 1977), and citations.

The trial court sustained the objection after which defendant's counsel made an offer of proof. One or two of the ex-jurors testified that in response to an inquiry of how long they would be kept out to deliberate Caslavka said, "I know Judge Degnan and he hates hung juries. He will let you hang for days if you don't make a decision." They also testified the statement had no effect on their decision making. Caslavka testified, "I don't think I made that statement." At least six of the ex-jurors had not heard such a statement. The record made in the form of an offer of proof demonstrates the wisdom of the well-established principles set out in *State v. Berch, supra,* and the trial court's ruling.

Full discussion by the jurors during deliberation and reaching of the verdict no doubt came as directed by the court in instructions numbered 22 and 23.

"Instruction No. 22. In passing upon the issues in this case you should be governed solely by the evidence and these instructions. You should not allow yourselves to be swayed by sympathy, passion or prejudice. At the commencement of this case you were admonished by the Court that during the trial of this case you were not to permit any communication to come to your attention from any source, public or private, concerning any matter relative to the trial of this case for the reason that it might consciously, or unconsciously, influence your verdict. You have taken your oath to decide the issues in this case solely on the evidence submitted for your consideration in this court room, and the instruction of the Court. Let your verdict be the result of a fair, dispassionate consideration of all the evidence and the instructions given you by the Court.

"Instruction No. 23. Upon retiring at the close of the case your first duty is to elect a foreman. The foreman acts as chairman. The chairman's duty is to see that discussion is carried on in an orderly and proper fashion; that the issues are fully and freely discussed; and that every juror is given an opportunity to express his views. When ballots are to be taken, the chairman will see that it is done, and will sign the form of verdict which is in accord with your decision.

"The attitude of jurors at the outset of their deliberations is important. It is seldom helpful for a juror, upon entering the jury room, to announce an emphatic opinion in a case, or a determination to stand for a certain verdict. When a juror does that at the outset individual pride may become involved, and the juror may later hesitate to recede from an announced position even when shown it is incorrect. You are not partisans, you are judges—judges of the facts. Your sole interest is to ascertain the truth."

Evidence of defendant's guilt was substantial. The court carefully submitted all issues raised by the evidence, including insanity and self-defense. While her trial was not perfect it was fair and that is all

she was entitled to. *State v. Webb*, Iowa, 244 N.W.2d 332, 333; *State v. Conner*, Iowa, 241 N.W.2d 447, 465; *State v. Kelsey*, Iowa, 201 N.W.2d 921, 927.

I find no abuse of the trial court's discretion in overruling defendant's motion for new trial.

I would affirm.