## IN THE COURT OF APPEALS OF IOWA

No. 15-1560
Filed February 22, 2017

**STATE OF IOWA,**
　　　Plaintiff-Appellee,

**vs.**

**STEPHEN ROBERT JONAS,**
　　　Defendant-Appellant.

_____

Appeal from the Iowa District Court for Polk County, Paul D. Scott, Judge.

The defendant appeals from his conviction for murder in the second degree, claiming the trial court erred in overruling his motion to strike a potential juror for cause, sufficient evidence to support the conviction did not exist, and his counsel was ineffective. **AFFIRMED.**

Mark C. Smith, State Appellate Defender, and Robert P. Ranschau, Assistant Appellate Defender, for appellant.

Thomas J. Miller, Attorney General, and Linda J. Hines, Assistant Attorney General, for appellee.

Considered by Vaitheswaran, P.J., and Potterfield and Bower, JJ.

**POTTERFIELD, Judge.**

Stephen Jonas appeals from his conviction for murder in the second degree as a lesser included offense of murder in the first degree. He asserts the trial court erred in overruling his motion to strike a potential juror for cause, there was insufficient evidence to support the conviction, and his counsel was ineffective for failing to object to statements made by the prosecutor during closing arguments. He also claims counsel was ineffective for failing to request a limiting instruction regarding another statement made during the prosecutor's closing argument. We affirm.

**I. Background Facts and Proceedings**

On August 23, 2014, Zachery Paulson was found dead in the lot of his father's business (the lot) bordering the Clive Greenbelt Trail. Following an autopsy, it was determined that the victim died from approximately thirty-five stab and incised wounds.[1] At the scene, the police discovered a ball-peen hammer and a cell phone belonging to the victim.

Shortly after the discovery of the body, the police contacted Jonas at his residence, and he voluntarily went to the police station to answer questions. Jonas's statements to the police and at trial became a central aspect of the prosecution's case.

During his first interview with the police, Jonas stated several times he was not involved and did not know anything about the victim's death. He also stated multiple times he was never at the scene where the victim's body was

---

[1] According to expert testimony, a stab wound is deeper than it is wide, while an incised wound is the opposite.

discovered. At no time during the first police interview did Jonas state that the victim struck him or that he was defending himself. In fact, he stated the large circular bruise on his chin was caused by tripping and falling on the concrete.

Following the interview, the police inspected Jonas's truck and asked questions about a stain in the truck the police believed was blood. In response, Jonas claimed the stain was chocolate or possibly blood from one of his children's injuries.[2] Jonas continued to deny involvement in, or knowledge about, the victim's death, even after the police gave him multiple opportunities to change his story. Jonas returned home.

That night, the police asked Jonas to come back to the station to answer more questions. Jonas complied. Initially, Jonas continued to state that he had no additional information. During the second interview, however, his story changed. When he was confronted with video evidence showing his truck near the scene, Jonas admitted to stabbing the victim but said he did so in self-defense.

At trial, Jonas testified that his encounter with the victim on the night of his death was not the first time he met the victim. Jonas and the victim were both regulars at a local bar and had been at the lot together an earlier time. Approximately one week before the victim's death, Jonas went to the lot with the victim and another acquaintance to drink some beers after the bars closed. As the parties were leaving, Jonas described physical contact with the victim. According to Jonas, he engaged in a mutual hug with the victim that led to

---

[2] Later testing confirmed the stain was blood matching the DNA of the victim.

kissing.[3]  Jonas continued to contact the victim via text message throughout the next week.  The text messages went unanswered.

According to Jonas's testimony, on August 22, 2016—the night of the victim's death—Jonas went to the local bar in an attempt to confront the victim about the events that took place at the lot earlier that week.  The victim acknowledged him, but no meaningful conversation took place.  After the bar closed, Jonas decided to drive to the lot in order to "speak with [the victim] about what had happened the previous week" and "find out what he was thinking."  Jonas testified that when he arrived at the lot, he offered the victim a drink and they engaged in casual conversation for a brief time.  Shortly after, Jonas suggested they both go outside to smoke a cigarette.  According to his testimony, as Jonas went to his car to get his cigarettes, he noticed the victim putting a hammer in his pocket.  While he was getting his cigarettes, Jonas pocketed a knife from his car.  He then walked to the back of the lot to meet the victim.  Jonas claimed that as he approached, the victim struck him in the chin with the hammer and a fight ensued.  Jonas told the police he remembered stabbing the victim only five times.  The victim was moaning when Jonas left the scene and eventually died from the wounds.

According to expert testimony, the victim suffered twenty-two stab wounds and fifteen incised wounds before he died.  The most significant wounds included a stab wound to the left eye penetrating into the globe of the eye, a stab wound to the abdomen, a stab wound into the chest cavity and lung, and a deep incised

---

[3] Other prosecution witnesses testified the victim described the contact as unwanted; the victim pushed Jonas away and asked him to leave.

wound between the right thumb and index finger that nearly severed the thumb. The wound to the thumb was consistent with a defensive wound where the victim likely grabbed the knife. According to expert testimony, the victim could have lived for five to fifteen minutes after the struggle ended.

On September 30, 2014, Jonas was charged by trial information with murder in the first degree. Jonas filed a notice of defense of justification. The trial began on July 2, 2015.

A written questionnaire asked each potential juror to indicate whether they would be prejudiced against Jonas because he identified himself as a gay man. During voir dire, Jonas's trial counsel challenged a potential juror for cause based in part on the juror's affirmative answer to the questionnaire; counsel argued the juror's prejudice against Jonas's sexuality prevented the juror from being fair and impartial. After counsel's request to strike the juror for cause, the court and the potential juror had the following exchange:

> Q. My questions for you is this: Does the fact that the defendant, Mr. Jonas, has identified himself as a gay man, does that fact alone cause you to be biased or prejudice against him in determining whether or not he's guilty or innocent in this case? A. Again, I don't think it would be determined whether he was guilty or innocent, but I would still have a bias there some place, yes.
> Q. Okay. So are you—if I instruct you as to what the law is, are you going to be able to follow what the law says? A. Yes.

After hearing arguments from both sides regarding the potential juror, the court made the following ruling:

> Well, my problem is he has said that he's going to have it in the back of his mind and that the defendant would be better off not having him as a juror. After he said that, he still continues to express the opinion that he could be fair and unbiased and be able to try a fair case.

And I just don't think that the record is there to strike him for cause at this point.  So I'm going to allow [the juror] to stay on the panel.

The juror was allowed to stay on the panel until defense counsel used a peremptory strike to remove the juror.

The jury returned a verdict of guilty for murder in the second degree. Jonas was sentenced to serve an indeterminate term of imprisonment not to exceed fifty years.  The sentence includes a seventy percent mandatory minimum before Jonas is eligible for parole, and $150,000 in restitution to the victim's estate.

Jonas appeals the conviction and the sentence.

## II. Standard of Review

We review the district court's rulings on for-cause challenges to prospective jurors for an abuse of discretion.  *State v. Tillman*, 514 N.W.2d 105, 107 (Iowa 1994).  "In ruling on a challenge for cause, the district court is vested with broad discretion."  *Id.*

We review challenges to sufficiency of the evidence for correction of errors at law.  *State v. Williams*, 695 N.W.2d 23, 27 (Iowa 2005).

We review claims of ineffective assistance de novo.  *State v. Straw*, 709 N.W.2d 128, 133 (Iowa 2006).

## III. Discussion

### A. Defendant's Challenge for Cause.

Jonas maintains the district court erred in overruling his motion to strike a potential juror for cause.  Iowa Rule of Criminal Procedure 2.18(5)(k) allows a party to challenge a prospective juror if the juror "form[s] or expresse[s] such an

opinion as to the guilt or innocence of the defendant [that] would prevent the juror from rendering a true verdict upon the evidence submitted on the trial." The trial court is vested with broad discretion when ruling on a challenge for cause. *Tillman*, 514 N.W.2d at 107. In order to overcome the court's ruling, "the defendant must show (1) an error in the court's ruling on the challenge for cause; and (2) either (a) the challenged juror served on the jury, or (b) the remaining jury was biased as a result of the defendant's use of all of the peremptory challenges." *Id.* at 108; *see also State v. Neuendorf*, 509 N.W.2d 743, 746 (Iowa 1993) ("In the absence of some factual showing that this circumstance resulted in a juror being seated who was not impartial, the existence of prejudice is entirely speculative.").

Jonas contends the court's ruling on the challenge was an abuse of discretion but does not argue the remaining jurors were prejudiced against him. The challenged juror did not serve on the jury. We decline to reach the merits of the court's denial of the challenge for cause since Jonas's claim does not meet the requirements of *Neuendorf*.[4] 509 N.W.2d at 746. Jonas did not challenge

---

[4] We note the juror never stated he could overcome his admitted bias, despite the court's efforts to rehabilitate him. The potential juror's last statement confirmed Jonas's sexuality would affect his ability to be fair and impartial: "Q. And [Jonas's sexuality] would affect your ability to be fair and impartial? A. Again, it would bother me, yes."

We are skeptical of rehabilitative efforts in these situations to remove deeply held prejudices. The voir dire setting alone invites a false sense of fairness by suggesting to the potential juror that acceptance of the rehabilitative efforts is socially desirable, despite their deeply held prejudices. *See* Judge Mark W. Bennett, *Unraveling the Gordian Knot of Implicit Bias in Jury Selection: The Problems of Judge-Dominated Voir Dire, the Failed Promise of* Batson*, and Proposed Solutions*, 4 Harv. L. & Pol'y Rev. 149, 160 (2010) ("As a district court judge for over fifteen years, I cannot help but notice that jurors are all too likely to give me the answer that they think I want, and they almost uniformly answer that they can 'be fair.'"); Mary R. Rose & Shari Seidman Diamond, *Judging Bias: Juror Confidence and Judicial Rulings on Challenges for Cause*, 42 Law

any of the remaining jurors on the panel for cause. *See Tillman*, 514 N.W.2d at 108 ("A lack of apparent prejudice is suggested by the fact that [the defendant] did not even challenge the members of the panel that were actually seated as jurors."). Jonas claims prejudice is automatic when a defendant is forced to use a peremptory strike on a juror challenged for cause, but our law does not support his claim. "[P]artiality of a juror may not be made the basis for reversal in instances in which that juror has been removed through exercise of a peremptory challenge." *Neuendorf*, 509 N.W.2d at 747. Despite Jonas's arguments against the *Neuendorf* requirement, "[w]e are not at liberty to overturn Iowa Supreme Court precedent." *State v. Hastings*, 466 N.W.2d 697, 700 (Iowa Ct. App. 1990). We affirm the district court's ruling on Jonas's motion to strike for cause.

**B. Sufficiency of the Evidence.**

*1. Justification Defense.* Jonas argues the State failed to prove beyond a reasonable doubt that he did not act with justification. "A person is justified in the use of reasonable force when the person reasonably believes that such force is necessary to defend oneself . . . from any imminent use of unlawful force." Iowa Code § 704.3 (2014). When a defendant raises justification as a defense, the State is required to prove the absence of justification. *State v. Shanahan*, 712 N.W.2d 121, 134 (Iowa 2006). To prove the absence of justification, the

---

& Soc'y Rev. 513, 516 (2008) ("[I]ndividuals recognize that fairness is a desirable characteristic, and most people want to believe that they possess it.").

In this case, the juror stated that he could follow the judge's instructions while simultaneously acknowledging that his bias would affect his fairness, a contradiction that illustrates the difficulty of rehabilitative efforts. Still, the requirements of *Neuendorf* prevent us from finding error without the requisite prejudice. 509 N.W.2d at 746 ("In the absence of some factual showing that this circumstance resulted in a juror being seated who was not impartial, the existence of prejudice is entirely speculative.").

State must establish, beyond a reasonable doubt, any one of the following elements:

> 1. The defendant initiated or continued the incident resulting in injury;
> 2. An alternative course of action was available to the defendant;
> 3. The defendant did not believe he was in imminent danger of death or injury and that the use of force was not necessary to save him;
> 4. The defendant had no reasonable grounds for such belief; or
> 5. The force used was unreasonable.

*Shanahan*, 712 N.W.2d at 134; *see also* Iowa Code § 704.3.

In assessing the sufficiency of the evidence, we view the record in a light most favorable to the State. *State v. Showens*, 845 N.W.2d 436, 439-40 (Iowa 2014). "We will uphold a verdict if substantial record evidence supports it." *Id.* (citation omitted). "If the evidence could convince a rational trier of fact the defendant is guilty of the charged crime beyond a reasonable doubt, it is substantial." *Shanahan*, 712 N.W.2d at 134. "The jury is free to believe or disbelieve any testimony as it chooses and to give weight to the evidence as in its judgment such evidence should receive." *State v. Thornton*, 498 N.W.2d 670, 673 (Iowa 1993).

Generally, a jury can rationally dismiss a self-defense claim when testimony is unbelievable or the evidence contradicts the elements of self-defense. In *Thornton*, for example, a defendant charged with first-degree murder claimed that he shot the victim in self-defense after the victim lunged at him with a knife. 498 N.W.2d at 672. In support of his claim, the defendant argued that he could not retreat because the events took place in a crowded room. *Id.* The

defendant, however, was able to leave the room immediately after the shooting. *Id.* at 673. The defendant also suffered no injuries, failed to call an ambulance, and did not call the police until the following day. *Id.* Our supreme court held, "[T]he jury could rationally believe these were not the actions of someone who honestly believed he acted in self-defense." *Id.* at 673–74.

We believe the jury in the present case could also rationally conclude that Jonas's actions surrounding the victim's death were consistent with the actions of someone who was able to retreat, or someone who continued the incident after the threat ended. *Id.* Examining the parties' injuries based on expert testimony suggests an alternative course of action was available to Jonas or he continued the incident unnecessarily. While Jonas did suffer some injuries, a reasonable jury could infer the approximate thirty-five stab and incised wounds suffered by the victim compared to Jonas's bruises were inconsistent with the absence of a an alternative course. In fact, Jonas sliced through the web between the victim's thumb and index finger nearly severing the victim's thumb, which rendered the victim's dominant hand useless. It was rational to conclude Jonas failed to retreat or continued the incident after the threat ceased, which satisfies the State's burden.

The *Thornton* court further explained a jury could rationally disbelieve a defendant's testimony that was inconsistent, uncorroborated, contradictory, and contrary to the actions of someone who was acting in self-defense. *Id.* at 673 ("Although [the defendant] claimed to be unable to retreat from the bar when [the victim] allegedly lunged, [the defendant] was able to easily leave the house without speaking to anyone immediately after the shooting. No other witnesses

saw [the victim] lunging or holding a knife; one witness even testified [the victim's] hands were at his side when [the defendant] shot him. The State presented evidence the knife may have simply fallen from the bar when the police moved the bar to get close to [the victim]."). We believe the jury in the present case could rationally choose to disbelieve Jonas's testimony. First, he admitted at trial that he was dishonest with the police, which undermined his credibility.[5] Second, Jonas's testimony was inconsistent and contradictory. Following the victim's death, for example, a witness stated that Jonas was seen throwing away garbage at the witness's apartment complex. However, Jonas claimed he "never" went to the dumpster and "it's all a figment of [the witness's] imagination."[6] Another witness claimed the victim described the first physical encounter with Jonas as unwanted to the point that the victim pushed Jonas away. Jonas claimed the victim never pushed him away and stated, "[The witness] just made that up."

---

[5] The following exchange took place between the prosecutor and the defendant:

> Q. [Y]ou are talking to [the police]. And when they ask you if you've been out with these guys or anywhere else or any other time, you say, "Never." A. As the record has stated and I have said, I was not completely forthright on the first [police] interview.
>
> Q. And so your answer is you weren't truthful with [the police]; right? A. I was not completely forthright.
>
> Q. And when they ask you about having phone numbers for either [the witness] or the victim, you tell them no, you didn't; right? A. I was not completely forthright.

[6] Before Jonas testified, the witness described Jonas's action the day following the murder: "I could see [Jonas] parked over across from the dumpsters, where he normally parked, and just throwing some stuff away."

During cross-examination, Jonas denied the witness's testimony:

> Q. And so you weren't down by the dumpster at all . . . A. No, I was not.
>
> Q. Never? A. Never.
>
> Q. So it's just all a figment of [the witness's] imagination? A. It's all a figment of [the witness's] imagination.

Jonas's actions were also inconsistent with someone who was acting in self-defense.  Like the defendant in *Thornton*, Jonas did not call an ambulance after he left the scene even though he knew the victim was alive.  *Id.*  Jonas avoided the police by failing to initiate any contact with them and by lying to them throughout the initial interviews.  Jonas also testified that after the incident, he took a shower and went to sleep instead of alerting authorities about the wounded victim, who was still moaning when Jonas left the scene.  Before his police contact, Jonas disposed of his weapon by throwing it over a bridge into the river, and he disposed of his clothes by throwing them into a field.  Based on the above, a reasonable jury could conclude the State met its burden in overcoming Jonas's self-defense claim.  *Id.*

*2. Murder-in-the-Second-Degree Conviction.*  Jonas argues the evidence was insufficient to support a conviction of murder in the second degree.  Murder in the second degree has two elements: (1) a person kills another person; and (2) the killing is done with malice aforethought.  *State v. Lyman*, 776 N.W.2d 865, 877 (Iowa 2010); *see also* Iowa Code § 707.1 ("A person who kills another person with malice aforethought either express or implied commits murder."); Iowa Code § 707.3 ("A person commits murder in the second degree when the person commits murder which is not murder in the first degree.").  "Malice aforethought requires the actor to have 'a fixed purpose or design to do physical harm to another that exists before the act is committed.'"  *State v. Tyler*, 873 N.W.2d 741, 751 (Iowa 2016) (citation omitted).  Because Jonas admitted to

stabbing the victim with a knife, a dangerous weapon,[7] which led to his death, the jury was instructed they could infer malice from that fact. *See State v. Hahn*, 259 N.W.2d 753, 758–59 (Iowa 1977) (stating a jury may infer malice aforethought when the defendant uses a deadly weapon); *see also Shanahan*, 712 N.W.2d at 135 (holding the defendant's use of a deadly weapon supports the inference of malice aforethought). Consequently, the jury could conclude Jonas's actions supported the malice element of second-degree murder.

### C. Ineffective Assistance of Counsel.

Jonas maintains trial counsel failed to object to prosecutorial misconduct[8] during the State's closing argument, and trial counsel failed to ask for a limiting instruction following an apparently sustained objection to another part of the prosecutor's closing argument. Specifically, Jonas argues the State made impermissible disparaging comments about Jonas's credibility. Jonas also

---

[7] "A 'dangerous weapon' is any instrument or device designed primarily for use in inflicting death or injury upon a human being or animal, and which is capable of inflicting death upon a human being when used in the manner for which it was designed . . . ." Iowa Code § 702.7. Jonas does not contest that the knife used was a dangerous weapon.

[8] In a recent case, the Iowa Supreme Court cautioned against conflating the terms prosecutorial misconduct, which generally describes "those statements 'where a prosecutor intentionally violates a clear and unambiguous obligation or standard imposed by law, applicable rule or professional conduct' as well as 'those situations where a prosecutor recklessly disregards a duty to comply with an obligation or standard,'" and prosecutorial error, which includes situations "'[w]here the prosecutor exercises poor judgment' and 'where the attorney has made a mistake' based on 'excusable human error, despite the attorney's use of reasonable care.'" *State v. Schlitter*, 881 N.W.2d 380, 394 (Iowa 2016) (citations omitted).

We use the term prosecutorial misconduct throughout, as both Jonas and the State did in their appellate briefs. We note that we are to apply the multi-factor test outlined in *State v. Graves*, 668 N.W.2d 860, 877–78 (Iowa 2003), either way. *See Schlitter*, N.W2d at 394. (stating the multifactor test set out to evaluate the statements in determining if there was misconduct and if that was misconduct was prejudicial "easily translate to an evaluation of prosecutorial error").

argues defense counsel failed to request a limiting instruction after the State asked the jury to "send a message that you can't kill someone like this."[9]

To succeed on an ineffective-assistance-of-counsel claim based on prosecutorial misconduct, a defendant must establish: (1) proof of misconduct; and (2) "the misconduct resulted in prejudice to such an extent that the defendant was denied a fair trial." *Graves*, 668 N.W.2d at 869. "A defendant's inability to prove either element is fatal." *See id.*

We turn to the prejudice element first. In his claim, Jonas is required to "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *State v. Carey*, 709 N.W.2d 547, 559 (Iowa 2006). In deciding prejudice, we analyze the following factors: "(1) the severity and pervasiveness of the misconduct; (2) the significance of the misconduct to the central issues in the case; (3) the strength of the State's evidence; (4) the use of cautionary instructions or other curative measures; and (5) the extent to which the defense invited the misconduct." *Graves*, 668 N.W.2d at 877. "The most important factor under the test for prejudice is the strength of the State's case." *Carey*, 709 N.W.2d at 559.

*1. The "Credibility" Comments.* During the State's closing arguments, the prosecutor stated in part, "[Jonas] is not credible," other evidence is "more credible than [Jonas]," Jonas is "making it up," and "[Jonas] is not being truthful

---

[9] Jonas concedes trial counsel objected to the prosecutor's statement about "send[ing] a message that you can't kill someone like this." Jonas argues trial counsel should have made a request "to the court that the jury be instructed to disregard the prosecution's statement." However, these statements did not result in unfair prejudice. Thus, we decline to address whether defense counsel failed to perform an essential duty regarding the limiting instruction.

with you about what happened down there." Under the first and second factors, misconduct regarding credibility statements that the prosecution relies on to link the defendant and the criminal conduct can demonstrate prejudice. *See, e.g.*, *Graves*, 668 N.W.2d at 877 (holding prosecutorial misconduct directed at the credibility of the defendant is extremely significant when the *only* link between the defendant and possession of a banned substance is the statement allegedly made by the defendant to the officer that he had been in possession of the banned substance). However, these circumstances are distinguishable from *Graves* because, unlike the defendant in *Graves*, Jonas testified he misled the police, which presented the issue of his credibility to the jury. Jonas's credibility was also impeached by contradictory testimony from multiple witnesses. Finally, the State submitted evidence that did not relate to Jonas's credibility in order to overcome his claim of self-defense. The prosecutor's statements regarding credibility were based on the evidence at trial and not the prosecutor's personal opinion. It is not prejudicial to attack the credibility of the defendant when the defendant admits dishonesty and calls into question the credibility of contradictory witnesses. *See Carey*, 709 N.W.2d at 560.

For similar reasons the strength of the State's case—the most important factor—was significant. This was not a case, like *Graves*, that hinged on a single admission to the police. 668 N.W.2d at 877–78 (holding the strength of the State's case is weak when the evidence outside of the defendant's statements is insufficient to support the charges). Again, the State submitted various forms of evidence that challenged Jonas's self-defense claim, including expert testimony, exhibits indicating the nature of the stab wounds, and witnesses whose testimony

contradicted Jonas's testimony. Furthermore, if the prosecutor's statements were removed, Jonas's credibility would still be in question because of his own statements and contradictory witnesses' testimony. *See Carey*, 709 N.W.2d at 560 (holding prejudice does not exist when there are severe inconsistencies in the defendant's testimony and other evidence is sufficient to overcome a justification defense).

Based on the above, there was not a reasonable probability the alleged misconduct prejudiced, inflamed, or misled the jurors so that the jury convicted Jonas for reasons outside the evidence at trial and the law within the court's instructions. *Graves*, 668 N.W.2d at 876–77.

***2. The "Send a Message" Comment.*** During closing arguments, the prosecution, the court, and defense counsel had the following exchange:

> PROSECUTER: When he stabbed the kid—it's a no-brainer—he had the specific intent to kill. He also tried to cover it all up; you know that now. That's no justification.
> Once we prove that, folks—again, murder in the first degree is what we charged him with—if you are satisfied, you put another checkmark. Whether—and this verdict has to be—*send a message that you can't kill someone like this.*
> . . . .
> THE COURT: [Defense counsel] has an objection.

(Emphasis added.) Following the objection, a discussion was held at the bench, off the record. The court did not rule on the defense objection following the bench conference and gave no limiting instruction.[10] The prosecutor moved to a different subject.

> PROSECUTER: Thank you.

---

[10] Jonas has not provided any record to show counsel failed to request a limiting instruction.

Let's talk about justification, because really, that's the issue he's now raising.

A panel of our court held it is improper for a prosecutor to ask the jury to "send a message" because the statement "urge[s] the jurors to convict the defendant in order to protect community values and prevent further criminal activity." *State v. Johnson*, 534 N.W.2d 118, 127 (Iowa Ct. App. 1995). However, these statements must also be prejudicial to the extent that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Carey*, 709 N.W.2d at 559. While Jonas did not invite these comments nor was a limiting instruction given, the comment was restricted to a small portion of the lengthy trial and closing arguments. The prosecution only made the comment once, and defense counsel immediately objected to the statement. The prosecution moved on and did not mention it again throughout the closing argument. *Compare State v. Musser*, 721 N.W.2d 734, 756 (Iowa 2006) (holding objectionable statements by the prosecution are not prejudicial when "[t]he evidence against the defendant was strong, the comments did not go to a central issue in the case, and the improper statements by the prosecutor were isolated [to the opening statement and closing argument]"), *and Johnson*, 534 N.W.2d at 128 (holding improper comments that were limited to a rebuttal argument and not repeatedly presented to the jury, although improper, are not prejudicial), *with Graves*, 668 N.W.2d at 883 (holding prejudice exists when the "misconduct permeated the entire trial because it was part of a theme developed by the prosecutor"). Furthermore, the isolated statement is not significant enough to outweigh the strong evidence used to convict Jonas, as outlined

above. The alleged misconduct did not result in the requisite prejudice to warrant a new trial, and Jonas's ineffective-assistance-of-counsel claim must fail.

## IV. Conclusion

Jonas claims the district court erred in ruling on his challenge for cause of a potential juror, substantial evidence did not exist to support a conviction, and his trial counsel was ineffective. Jonas cannot demonstrate the requisite prejudice to prevail on his claim that the court erroneously denied his challenge of a juror. Substantial evidence existed to overcome Jonas's justification defense because a reasonable jury could conclude that Jonas initiated or continued the fight or had an opportunity to retreat. Similarly, substantial evidence existed to support the malice element of second-degree murder. Finally, Jonas's counsel was not ineffective because the prosecutor's statements during closing arguments did not result in the necessary prejudice to warrant a new trial.

**AFFIRMED.**