# IN THE COURT OF APPEALS OF IOWA

No. 24-0127
Filed January 9, 2025

**STATE OF IOWA,**
        Plaintiff-Appellee,

**vs.**

**IVAN SAMUEL BRAMMER,**
        Defendant-Appellant.
_____

        Appeal from the Iowa District Court for Pottawattamie County, Richard H. Davidson, Judge.


        A criminal defendant appeals his convictions for murder in the second degree, abuse of a corpse, and theft in the second degree. **AFFIRMED.**


        Krisanne C. Weimer of Weimer Law, P.C., Council Bluffs, for appellant.

        Brenna Bird, Attorney General, and Kevin Cmelik, Special Counsel, for appellee.


        Heard by Greer, P.J., and Buller and Langholz, JJ.

**BULLER, Judge.**

Ivan Brammer appeals his convictions for second-degree murder, abuse of a corpse, and second-degree theft, related to the killing of his on-and-off girlfriend Ilene Gowan. Brammer argues prosecutorial misconduct deprived him of a fair trial, that the jury instructions on territorial jurisdiction misstated the law, and that the district court abused its discretion when imposing consecutive sentences. Limiting our review to the errors preserved for review, we affirm.

I.     **Background Facts and Proceedings**

The day before Valentine's Day in 2023, Ilene[1] went missing. Brammer and Ilene had been in a relationship described by Ilene's daughter as "very unhealthy" and "on and off." Ilene's manager similarly described the relationship as a "roller coaster, [with] ups and downs." Before Ilene's disappearance, she and Brammer had been fighting so much that Ilene's daughter—who the two were living with— asked them to move out. Brammer and Ilene moved in with Brammer's adult granddaughter, but then Ilene and Brammer had a fight. Brammer asked Ilene to leave, and she stayed for a couple days with Michael Brockman, a male acquaintance.

Ilene and Brammer both worked at Sugars, a Council Bluffs lounge and diner. The day Ilene disappeared, Ilene's manager saw her leave at 8:30 a.m. following her morning cleaning shift; surveillance video shows Ilene leaving the parking lot in Brammer's truck. Ilene was normally a very dependable worker and, when she didn't show up on time for her 2:00 p.m. shift later that day, her manager

---

[1] We refer to Ilene by first name because of the shared surnames and family relationships of trial witnesses.

sent a text message to Ilene's phone number. Ilene didn't reply, so the manager reached out to Brammer. "Very quickly" after messaging Brammer, the manager received a reply from Ilene's number: "I'm done, leave me alone." The manager didn't think this sounded like Ilene at all and, when Ilene never came in for her shift, the manager grew suspicious someone else had texted her using Ilene's phone. Ilene's daughter reported her missing that night. Brammer made inconsistent statements to his family about when he last saw Ilene, initially telling his son that "some girl" picked Ilene up from Sugars, then that he dropped her off at Brockman's, and later that he dropped her off on the side of the road near Brockman's but not at his house.

Police first spoke with Brammer on February 15, and he told officers he picked Ilene up at Sugars and took her straight to Brockman's. In a second interview two days later, Brammer said he took Ilene to her mother's house and then to Brockman's. But police were not able to verify Brammer's claim he dropped Ilene off at Brockman's, despite checking video from public works, traffic, and security cameras. In a third interview a week later, Brammer said he took Ilene to Carter Lake before taking her back to Brockman's. Despite being confronted with evidence during these interviews, Brammer denied any recollection of driving across the river into Omaha or driving into rural Pottawattamie County near Treynor. There were inconsistencies among Brammer's statements. As police put it, whenever they reinterviewed him, Brammer's "story changed again."

Surveillance video and cell-tower data aligned with bits and pieces of Brammer's version of events, while also placing him in Omaha and near Treynor where Ilene's body was later found. On February 13, video surveillance footage

spotted Brammer picking Ilene up at Sugars at 8:32 a.m., with Ilene at her mother's apartment at 8:45 a.m., at apartments near Sugars at 9:10 a.m., and then westbound toward Omaha at 9:28 a.m. There was about an hour-long gap in the footage between Brammer and Ilene going westbound toward Nebraska at 9:28 a.m. and then eastbound back into Council Bluffs at 10:24 a.m. Cell-tower data established that, during this gap, Ilene's phone and Brammer's phone were traveling together across the river to a park area near Carter Lake, bordering Nebraska and Iowa, where they remained until 10:17 a.m. At about 10:30 a.m., surveillance footage showed Brammer in the drive-thru of a Council Bluffs Burger King. Ilene can be seen in the passenger seat, but police described her as "unnatural and unmoving" while Brammer was breathing heavily. Footage then captured Brammer driving eastbound with Ilene still unnaturally positioned in the passenger seat, before heading north, stopping at a gas station, and driving out on the highway near Treynor at 11:46 a.m. and back at 12:34 p.m. Ilene and Brammer's phones were traveling together, and both were in use around Treynor for about half an hour starting at 12:34 p.m. Brammer was seen on surveillance footage back at his apartment by 12:59 p.m., tossing something in the apartment dumpster. And both phones were again together at Brammer's residence—at one point connected to the same tower—during the evening of February 14.

The subsequent police investigation revealed that, two days after Ilene disappeared, Brammer deposited $1200 cash into his bank account. Brammer told a deputy sheriff the money came from "selling tools on Facebook marketplace," but Brammer's son testified he was responsible for storing Brammer's tools and they hadn't sold any around the time Ilene disappeared.

Brammer eventually admitted in a police interview that a small black safe Ilene was seen carrying in surveillance footage on February 13 contained several hundred dollars cash.

On February 19, Brammer's granddaughter called police for a welfare check on him. In her words:

> he kept telling me how he was going to kill himself, and so he gave me a hug and kiss goodbye and then he walked out the door. And I started freaking out and then he sent messages to the whole family saying I love you, and stuff like that, and so we called because we thought he would commit suicide.

Brammer's granddaughter also observed that he was abusing alcohol and "angrier" since Ilene disappeared. At some point around this time—after Ilene went missing—Brammer's granddaughter also saw him with Ilene's phone, which she had never observed before.

A few days after the welfare check, police attempted to approach Brammer to follow up on Ilene's investigation. Brammer eluded officers in a high-speed chase through a residential neighborhood, traveling in excess of fifty miles per hour. He was arrested a few days later, but his granddaughter posted his bond.

The day after he bonded out, Brammer asked his granddaughter to follow him to a salvage yard because he "wanted to crush his truck." He said it was "knocking" (making noises), but his granddaughter never heard any of the so-called "knocking." After crushing the truck at the salvage yard, Brammer told his granddaughter that, if police asked what happened to the truck, she should tell them she didn't know where it was. The same day, Brammer pawned a diamond earring Ilene had given him as a symbol of commitment.

The next day, a Pottawattamie County deputy sheriff responded to a 911 call reporting a "dead body" near Treynor. The deputy found Ilene's corpse off the side of the highway and observed there "appeared to be a ligature mark on her neck mid throat around the thyroid area."

An associate state medical examiner performed an autopsy. The pathologist found lacerations, contusions, and abrasions all over Ilene's body—including her scalp, head, face, right ear, neck, arms, thighs, legs, chest, back, and hip—and multiple fractured teeth. The pathologist also spotted an abrasion on Ilene's neck but no injuries to the internal neck musculature. The associate medical examiner ruled the cause and manner of death "undetermined," essentially saying she did not have enough evidence or information to render an opinion. A second pathologist in the medical examiner's office signed a "quality assurance" slip for these findings.

Unsatisfied with the undetermined findings, Ilene's family hired Dr. Michael Baden—described at trial as an "infamous" and nationally recognized pathologist—to review the case and offer a second opinion. Dr. Baden's career in forensic pathology stretches fifty years, including stints as the Chief Medical Examiner for New York City and as the Chief Forensic Pathologist for the New York State Police. And he has worked on and testified in several high-profile matters. Dr. Baden estimated he had performed more than 20,000 autopsies and, in his current private practice, testified roughly equally for the prosecution and defense. He explained that he believed his fee—a sum of $17,000 for his trial testimony and report—was reasonable given his expertise.

After reviewing the Iowa pathologist's work and photographs of the autopsy, Dr. Baden opined that Ilene was killed by "traumatic asphyxia due to neck compression" and the manner of death was homicide. Dr. Baden concluded that Ilene's killer had essentially strangled her with the zippered jacket she was found wearing, as evidenced by a "zipper imprint" left on the skin of her neck. He also confirmed and built on the Iowa pathologist's testimony regarding the blunt-force injuries, identifying "more than thirty-three separate impacts" on Ilene's body, which he opined were evidence of a "struggle in which she was beaten." Dr. Baden explained that the level of certainty for pathologists' opinions varied across the country, but he held himself to a standard of "more than" or "beyond" 95% certainty.

A jury found Brammer guilty as charged, returning verdicts of murder in the second degree, a class "B" felony in violation of Iowa Code sections 707.1 and 707.3 (2023); abuse of a corpse, a class "C" felony in violation of section 708.14(1)(b) and (2); and theft in the second degree, a class "D" felony in violation of Iowa Code section 714.1(1) and 714.2(2). The district court sentenced him to consecutive terms in prison for a total indeterminate term of sixty-five years with a mandatory minimum of thirty-five years. Brammer appeals.

## II. Discussion

Brammer raises three categories of appellate challenges: allegations of prosecutorial misconduct, arguments about the jury instructions on territorial jurisdiction, and a challenge to the imposition of consecutive sentences. We address each claim, including embedded issues related to error preservation.

### A. Prosecutorial Misconduct

As we understand Brammer's brief, he challenges two groups of statements from the prosecutors' opening statement, closing argument, and rebuttal:

- comments he alleges were burden-shifting, such as "[t]he defendant will have no explanation for why he would have Ilene's cell phone," "nobody asked the question of [the police witnesses] what was done" in terms of DNA testing, and an observation that the defense had only offered one exhibit into evidence; and

- argument he alleges vouched or impugned the credibility of a witness (such as referring to Brockman, the defense's hypothesized alternate suspect, as "probably the worst defense scapegoat ever").

We acknowledge the State's error-preservation concerns regarding some of these comments and the lack of contemporaneous reported objections. Sidebars were taken after some but not all of these statements, and the record was reconstructed afterward in a way that is not crystal clear, suggesting the court didn't quite overrule or sustain some objections but instead directed corrective action by the prosecutor. We recognize this is doubly problematic in the context of a prosecutorial-misconduct claim, given the distinction drawn between sustained and overruled objections: if the objection is sustained, error is only preserved if the defendant also moves for a mistrial.[2] *See State v. Neiderbach*, 837 N.W.2d 180, 209 (Iowa 2013). For purposes of this appeal, we assume without deciding

---

[2] We recognize the district court was loath to have a reported objection argument in the midst of closing argument, given logistics with the jury, but recreating the record after the fact is perilous in other ways. Here, the record made immediately after closing argument does not indicate the defense made a motion for mistrial, while it was suggested they did make such a motion when the lawyers summarized that argument two months later at hearing on the motion for new trial. We have no way of knowing which recollection is correct—though if we had to choose, we are inclined to think the more-recent-to-trial recitation of no mistrial motion is more likely accurate. Given the state of the record, we assume without deciding a mistrial motion was made.

error was preserved on all statements that prompted a sidebar at trial, and we consider both groups of statements referenced in the appellate briefing. We cannot consider any objections that were made for the first time in Brammer's motion for new trial. *See, e.g.*, *State v. Steltzer*, 288 N.W.2d 557, 559 (Iowa 1980).

Before us, Brammer only alleges prosecutorial misconduct—not prosecutorial error. As defined by our supreme court, "prosecutorial misconduct involves either the prosecutor's reckless disregard of a duty to comply with the applicable legal standard or obligation, or a prosecutor's intentional statements in violation of an obvious obligation, standard, or applicable rule . . . ." *State v. Coleman*, 907 N.W.2d 124, 139 (Iowa 2018). Misconduct requires more than "human error or the exercise of poor judgment." *Id.* But it does not necessarily require bad faith. *Id.*

We review rulings on alleged prosecutorial misconduct for an abuse of discretion. *Id.* at 134. To warrant relief, a criminal defendant must establish both misconduct (whether reckless or intentional) and that the misconduct was so prejudicial it deprived him of his right to a fair trial. *Id.* at 138. In assessing the prejudice prong, we consider five factors:

> (1) The severity and pervasiveness of misconduct;
> (2) the significance of the misconduct to the central issues in the case;
> (3) the strength of the State's evidence;
> (4) the use of cautionary instructions or other curative measures; [and]
> (5) the extent to which the defense invited the misconduct.

*Id.* at 140 (citation omitted) (formatted for readability). The ultimate inquiry is whether "the misconduct resulted in prejudice to such an extent that the defendant was denied a fair trial." *State v. Graves*, 668 N.W.2d 860, 869 (Iowa 2003).

Looking first at the allegedly burden-shifting comments, for purposes of judicial economy we bypass assessing whether they were reckless or intentional prosecutorial misconduct under existing law—as would be necessary to establish a claim of prosecutorial misconduct rather than error. And we instead proceed directly to the fair-trial prejudice analysis, recognizing our supreme court's observation that "[p]rejudice can, but usually does not, result from isolated prosecutorial misconduct." *State v. Anderson*, 448 N.W.2d 32, 34 (Iowa 1989).

In reviewing the required considerations, we find the allegedly burden-shifting statements neither severe nor pervasive—at most a few lines out of many pages of argument sandwiching a week-long trial. We recognize a plausible interpretation of the comments relates to the many changing (and false or misleading) stories Brammer told police and his family, rather than his failure to testify. In our view, and seemingly the parties' at trial, the central fighting issue before the jury was cause and manner of death—not Brammer's possession of Ilene's cell phone or whether certain DNA testing was performed. We also believe the State presented a compelling albeit circumstantial case against Brammer, given the extensive surveillance footage and digital forensics, as well as Brammer's changing stories, unusual behavior, potential destruction of evidence, and encouraging his granddaughter to lie to police to thwart the investigation. And we recognize the jury received the standard instructions on burden of proof, presumption of innocence, and the defendant's failure to testify—all of which weigh against prejudice from the prosecutors' comments. The same goes for the county attorney's own corrective statement that followed an objection (as encouraged or required by the court):

> The defense, obviously, has no burden to put any evidence on, but when they make an argument, they are subject to the same credibility determinations as anything that the State says. They don't have to put on any evidence, they don't have to ask a question. They don't have to do that for any particular witness, but when they stand up here and ask a question of why you don't have that evidence when they have chosen to go a different route, it's for you to learn the truth in this case.

Although we might tweak some of this extemporaneous phrasing from the comfort of appellate review, this corrective statement was a fair statement of established law. For example, in *State v. Davisson*, we held the prosecutor did not impermissibly shift the burden when he argued: "Defense counsel also has an opportunity, if they bring forth an idea like mistake of fact, to bring people in, to subpoena people." No. 15-1893, 2016 WL 7393890, at *2–3 (Iowa Ct. App. Dec. 21, 2016) (holding "prosecution comments that are aimed at exposing a lack of evidence to support a defendant's general theory or a particular proposition are not improper." (citing *State v. Hanes*, 790 N.W.2d 545, 556–57 (Iowa 2010))). In our assessment of the pertinent factors, we discern no abuse of discretion in the district court's handling of Brammer's burden-shifting objections, and we find Brammer is owed no relief on appeal.

We analyze the allegedly vouching statements—essentially the prosecutors' argument that Brockman was an unconvincing alternative suspect—first by exploring whether the prosecutors recklessly or intentionally violated established law. Like all lawyers, prosecutors are entitled to "some latitude" during closing arguments. *State v. Carey*, 709 N.W.2d 547, 554 (Iowa 2006) (citation omitted). And argument based on a "legitimate assessment of the evidence" does not constitute misconduct just because the comments dip into the "sarcastic and

snide." *Id.* at 555. A core facet of the defense theory at this trial was to chip away at Brockman's alibi. And it was only natural for the State's attorneys to address the quality of that alternate-suspect theory in closing argument. *See Coleman*, 907 N.W.2d at 140 ("[I]t is not prosecutorial misconduct for the prosecutor to make statements aimed at the theory of the defense . . . ."). We also find the context surrounding the "scapegoat" comment—grounded in trial testimony regarding Brockman's alibi—suggests the comment was fair but colorful commentary on the evidence. "[W]e have long given prosecutors some leeway for rhetorical flourishes in closing argument." *State v. Meyer*, No. 18-0354, 2019 WL 1933990, at *4 (Iowa Ct. App. May 1, 2019). And while the prosecutor's "scapegoat" comments may have been uncouth, they were the type of sarcastic sass, snide aside, or rhetorical flourish that does not rise to the level of reckless or intentional misconduct. Last, while we need not belabor the point, we also recognize Brammer cannot show fair-trial prejudice on these statements for many of the reasons we have already discussed in reference to alleged burden-shifting, and this independently compels us to conclude the district court did not abuse its discretion in handling the objections.

## B. Territorial Jurisdiction

Next, Brammer raises claims related to the jury instructions on territorial jurisdiction. The context is our statute on territorial jurisdiction in homicide cases, which provides: "If the body of a murder victim is found within the state, the death is presumed to have occurred within the state." Iowa Code § 803.1(2). The State contests error-preservation, urging the issue advanced on appeal was not preserved below. We confront this potential barrier to review before going further.

At trial, Brammer's attorney offered two objections to the relevant instruction: first, that it was "not a model jury instruction"; and second, that the "presumption language is prejudicial . . . and the jury should be allowed to come to their conclusion whether the crime was actually committed in this jurisdiction or not without having any presumption imported to them."  On appeal, the majority of Brammer's argument is that the element of territorial jurisdiction had to be included in the marshaling instruction—not in a separate instruction.  *See State v. Straw*, 185 N.W.2d 812, 816 (Iowa 1971) (holding a marshaling instruction must contain all essential elements); *State v. Liggins*, 524 N.W.2d 181, 184–85 (Iowa 1994) (holding territorial jurisdiction is an essential element).  But this objection was not made below.  Brammer's secondary argument is that the jury should have received language more like the instruction quoted in *Liggins*—where the jury was expressly told the presumption led to a permissive rather than mandatory inference.  *See* 524 N.W.2d at 184–85.  That objection was not made below either: Brammer did not ask for a permissive inference, but instead for "not . . . having any presumption imported to [the jury]," seemingly in defiance of section 803.1(2).  We agree with the State that Brammer argued "the instruction should not be given," rather than requesting language different from a verbatim reproduction of statutory text.

"It is a fundamental doctrine of appellate review that issues must ordinarily be both raised and decided by the district court before we will decide them on appeal."  *Meier v. Senecaut*, 641 N.W.2d 532, 537 (Iowa 2002).  This rule extends to jury instructions, such that an "objection must be sufficiently specific to alert the trial court to the basis of the complaint so that if error does exist the court may correct it before placing the case in the hands of the jury*." Moser v. Stallings*, 387

N.W.2d 599, 604 (Iowa 1986); *cf. State v. Davis*, 951 N.W.2d 8, 16 (Iowa 2020) ("[O]ur adversary system imposes the burden upon counsel to make a proper record to preserve error, if any, in this factual circumstance by specifically objecting to instructions in their final form, requesting instructions and voicing specific exception in event they are refused." (citation omitted)). In other words, if a party wishes to preserve a complaint about a defective instruction, the district court must "be given an opportunity to pass upon the objection and correct any error." *See State v. Dessinger*, 958 N.W.2d 590, 598 (Iowa 2021).

This opportunity to correct potential defects matters. Here, it is hard for us to imagine that, if Brammer had asked for the element of territorial jurisdiction to appear in each marshaling instruction, the court would not have considered or accommodated the request. The same likely goes for including the permissive-inference language from *Liggins*. We also recognize that this transcript—like those from many trials—is replete with references to off-the-record discussions and email correspondence between the parties and the court, and that it is entirely possible adding this language was considered and declined by Brammer for tactical reasons. And we are mindful that a litigant should not be permitted to hedge their bets by spotting potential errors, declining to bring them to the court's attention, and gambling on that error as an escape hatch if the verdict goes sideways. *See State v. Crawford*, 972 N.W.2d 189, 199 (Iowa 2022).

We are "a court for the correction of errors at law." Iowa Code § 602.5103(1). "If an issue was never presented to the district court to rule on, and if the district court did not in fact rule on it, we lack any 'error' to correct." *State v. Gomez Medina*, 7 N.W.3d 350, 355 (Iowa 2024). "Had the defendant raised the

argument, we don't know how the district court would have ruled on it." *Id.* Because we lack an error to correct, we cannot review Brammer's complaints about the marshaling instruction or the permissive-inference language relating to territorial jurisdiction.

### C. Consecutive Sentences

Last, Brammer asserts the district court abused its discretion in imposing consecutive sentences for the second-degree murder, abuse of a corpse, and second-degree theft convictions. "[T]he decision of the district court to impose a particular sentence within the statutory limits is cloaked with a strong presumption in its favor, and will only be overturned for an abuse of discretion or the consideration of inappropriate matters." *State v. Formaro*, 638 N.W.2d 720, 724 (Iowa 2002). "[O]ur task on appeal is not to second guess the decision made by the district court, but to determine if it was unreasonable or based on untenable grounds." *Id.* at 725. Specific to consecutive sentences, the rationale for consecutive terms may be the same reasons warranting incarceration, but they must be explicitly stated. *See State v. Hill*, 878 N.W.2d 269, 275 (Iowa 2016).

Brammer claims that his age and lack of criminal history warranted concurrent sentences, while the State counters that Brammer committed one of the most serious crimes in the code when he killed Ilene, followed by an opportunistic theft of cash and "unceremoniously discard[ing her] body in a known garbage heap."

The reasons given by the court at sentencing largely track the State's argument on appeal:

My reasons for the consecutive sentence is that all three are separate, distinct and serious crimes separated by time with separate actions. Mr. Brammer, the overall reason for this sentence, concerning all three counts, is the cruelty and seriousness of the crimes, your need and potential for rehabilitation and protect the community.

You stole Ilene's life, threw away her lifeless body and then again stole from her finances. Your senseless and cruel acts have taken a mother, a daughter, an aunt, and numerous friends.

We discern no abuse of discretion.

**AFFIRMED.**